957 P.2d 755 (1998)
135 Wash.2d 518
In the Matter of the ESTATE OF Estelle Champoux LINT, Deceased.
James A. MURPHY, Gerald Champoux, Alan Champoux, Donald Champoux, Theresa Laurent, Michelle Gaedke, Malissa Reinders, and Heidi Reinders, Respondents,
v.
Christian LINT, Appellant.
No. 64795-0.
Supreme Court of Washington, En Banc.
Argued January 27, 1998.
Decided June 25, 1998.
As Amended July 9, 1998.
*757 Weber & Gunn, Kenneth W. Weber, Vancouver, Amicus Curiae on behalf of Kenneth Weber.
Arnold J. Barer, Elena Garella, Law Offices of Arnold J. Barer, Seattle, for Appellant.
Garvey, Schubert & Barer, Bruce McDermott, Carol Saboda, Williams, Kastner & Gibbs, Robert Lorentzen, John Knox, Seattle, for Respondents.
*756 ALEXANDER, Justice.
Appellant, Christian Lint (Christian), obtained direct review of the King County Superior Court's determination that a will Estelle Champoux Murphy Lint (Estelle) executed shortly before her death was invalid, and that Christian's marriage to Estelle was void. The principal questions we are asked to resolve in this case are these: (1) was there sufficient evidence to support the trial court's conclusion that Estelle's will was procured by undue influence or fraud?; and (2) did the trial court have jurisdiction to declare Estelle's marriage to Christian void? We answer each of the questions in the affirmative and conclude, additionally, that the trial court properly held that Estelle and Christian's marriage was void due to lack of solemnization and exceptional circumstances indicating that fraud of the grossest kind was practiced on Estelle. We, therefore, affirm the trial court.
Because, for reasons we set forth hereafter, we conclude that the trial court's findings of fact are supported by substantial evidence, our recitation of the facts is taken largely from those findings. They reveal the following: Estelle was formerly married to Ron Murphy. Their 30-year marriage ended in 1983 when Murphy, an attorney, died. Murphy, along with his brother Jim Murphy, had long been associated with a law firm now known as Ogden, Murphy, Wallace. During Estelle's marriage to Ron Murphy, she was known as a private and independent person who maintained a carefully chosen circle of confidants. For over 10 years following Ron Murphy's death, Estelle maintained a close relationship with her deceased husband's family, including Jim Murphy.
Estelle met Christian, who was 18 years her junior, in 1991 at a charity function in Seattle. Following that meeting they struck up a friendship and began dating and attending various functions together. From the time they began dating and up until September 1995, Christian "maintained relationships with other women," including a "longtime girlfriend." Finding of fact 6, Clerk's Papers (CP) at 2314. Estelle apparently enjoyed attending social events with Christian, but nevertheless indicated to friends that she had no reason to remarry.
In 1993, Estelle executed a will after conducting an extensive review of her estate plans with Jim Treadwell, an attorney with the law firm of Karr, Tuttle, Campbell. In this will, Estelle revoked all prior wills and provided that upon her death, her estate was to be divided into equal shares. One of the shares was to pass to Jim Murphy while the others were to go to certain named relatives. During her meetings with Treadwell, Estelle made no mention of Christian.
In April of 1995, Estelle was found to have metastasized carcinoma in her lungs. The following June, she underwent surgery to remove a portion of her left lung. From that time forward, "Estelle's cancer never ceased in its steady path of destruction of her body, including her brain, abdomen, and spine." Finding of fact 19, CP at 2316. Just before entering the hospital for the operation on her lung, Estelle left instructions with a woman who cared for her dogs that no family members should be told about the surgery until Christian communicated Estelle's permission. After the surgery was performed, Christian *758 contacted Jim Murphy, at Estelle's request, and told him about the surgery. Murphy and his wife, Janet, then visited Estelle at the hospital.
During Estelle's stay at the hospital, a hospital social worker suggested to Estelle that she should execute a health care power of attorney. Consequently, Christian contacted Scott Snyder, an attorney at Ogden, Murphy, Wallace who had handled legal matters for Estelle in the past. Snyder prepared a power of attorney for Estelle but she did not sign it. At about this time, Estelle and Jim Murphy became estranged.
On July 18, 1995, Estelle was again admitted to a hospital after it was discovered that she had a metastasized lesion on her brain. Her treating physician indicated in his notes that Estelle appeared at that time to be "confused and oriented only to herself." Finding of fact 10, CP at 2314. A speech pathologist at the hospital noted that Estelle had "`moderate-severe aphasia ... affecting comprehension.'"[1] Finding of fact 10, CP at 2314. A neuropsychologist, Dr. Taylor, observed that Estelle showed signs at this time of "verbal and motoric perseveration, stereotyped phrases, inability to pick objects from an array, and that the `degree of receptive aphasia suggests possibly more extensive involvement' of brain tumors." Finding of fact 10, CP at 2314. Dr. Rieke, Estelle's radiation oncologist, diagnosed her condition at this time as "terminal" and prescribed "a course of palliative treatment." Appellant's Br. at 10.
On August 3, 1995, Christian and Estelle met with Treadwell. At this meeting, Christian asked Treadwell to draw up a financial power of attorney for Estelle, naming Christian as her attorney in fact. Treadwell advised against this course of action and instead prepared papers, which Estelle signed, giving Christian joint power of attorney with Estelle's accountant, Dave Clements.
At about this time, Christian moved into Estelle's home in the exclusive Highlands area of King County. By August 7, Christian had dismissed Estelle's housekeeper of 15 years and hired two of his employees, Donna Love and Dan Fenton, to assist in caring for Estelle.[2] Christian asked Love to keep a logbook of all activities occurring at Estelle's house.
Christian then began to "systematically and persistently" isolate Estelle from friends and family, including three of her long-time friends Mary Bowles, Karen Phillips, and Janet Murphy. Finding of fact 15, CP at 2315. He also instructed Love to take messages from people who called for Estelle, but not to respond to inquiries about her health. Love was also told by Christian to make entries in her logbook "`wherever she can'" to indicate that he had checked on Estelle. Finding of fact 16, CP at 2315. At one point Christian had all telephone calls to Estelle's house forwarded to his office. Christian also instructed Estelle's doctors not to release information about Estelle's medical condition to her family. A hospice nurse who visited Estelle's home was told by Christian that Estelle's family was trying to have her "declared incompetent and put in the hospital or a nursing home." Finding of fact 18, CP at 2315. The nurse was instructed by Christian not to put anything in the logbook that would suggest that Estelle was incompetent.
Estelle's physical condition continued to deteriorate. On September 27, 1995, one of her doctors changed her prescription for Pamelor, an antidepressant, from 25 mg three times a day to one daily dosage of 75 mg. The following day, Dr. Rieke concluded that Estelle had only a short time to live. His contemporaneous notes indicate that Estelle showed "`neurologic deterioration over [the] last two to three days,'" and "`cognitive problems.'" Finding of fact 23, CP at 2316. When Rieke suggested to Estelle that she be admitted to the hospital, she refused, indicating that she wanted to remain at home.
On September 29, 1995, a supervisor with the Snohomish Hospice team interviewed Estelle at her home and noted that Estelle's *759 conversation consisted of "`word salad.'" Finding of fact 24, CP at 2316. Christian told the interviewer that he had a health care power of attorney for Estelle, but he was unable to produce the document. That evening, Christian asked James Lynch, a notary public, to notarize Estelle's signatures on health care and financial powers of attorney. Lynch who had come to the house, declined to notarize the documents because, in his opinion, Estelle was "`groggy'" and did not appear to "understand what was going on." Finding of fact 25, CP at 2317.
On October 3, 1995, the hospice supervisor informed Christian that unless he produced a power of attorney, she would release medical information to Estelle's family. On that same day, a hospice nurse discovered that Estelle was receiving an overdose of Pamelor, as a consequence of a mistake on Christian's part. A hospice employee who attempted to follow up regarding the Pamelor overdose, was informed by Christian that Estelle was "`doing great'" and "`wanted to take a trip today.'" Finding of fact 30, CP at 2317. Love's logbook indicated that between October 5 and October 9, 1995, Estelle engaged in bizarre behavior, including "attempt[ing] to brush her teeth with cleaning fluid, attempt[ing] to take suppositories orally, lit matches and yelled `fire', buttered a photograph and tried to eat it, put her foot in a bowl of sugar, and talked about having a nice dinner of `bell bottom toad, all Oriental food.'" Finding of fact 29, CP at 2317.
On October 11, 1995, Christian, Estelle, Love and Jim McKenna, Love's boyfriend, traveled to Las Vegas. Upon arriving in that city, they proceeded to the "We've Only Just Begun Wedding Chapel." Finding of fact 32, CP at 2317. Although Christian and Estelle did not have a marriage license, the chapel's on-duty reverend, Forrest Walser, agreed to perform a nonbinding wedding ceremony. A videotape of the mock ceremony reveals that Estelle was not well and that she could not stand without aid. It also reveals that she was unable to complete sentences or repeat words after they were spoken to her. Walser suggested that if Christian and Estelle "want[ed] to make it official" they should go to the Clark County, Nevada, courthouse to obtain a marriage license and he would perform the ceremony later that day. Finding of fact 33, CP at 2318. Christian, Estelle, Love, and McKenna then took a taxicab to the courthouse in order to obtain a marriage license. While en route, Christian helped Estelle practice writing her name. At the courthouse, Estelle was observed "wander[ing] around ..., picking up pencils." Finding of fact 37, CP at 2318. She also appeared to Love to be unable to fill out her portion of the license or answer questions about her family. Nevertheless, a marriage license was issued to Christian and Estelle.
Upon returning to their hotel room, Christian telephoned Walser who agreed to perform the ceremony. When Walser arrived at Christian and Estelle's hotel room, he engaged in "small talk" with them for 15 to 20 minutes, during which time there was an exchange of money and presentation of the marriage certificate. Although Walser indicated that vows were exchanged, his assertion was "not convincing." Finding of fact 39, CP at 2319. Love said that vows were not recited by Christian or Estelle at this time. Walser did, however, sign the marriage certificate and Love signed as the sole witness required by Nevada law.
On October 12, 1995, Love and McKenna returned to Seattle and Christian and Estelle traveled on to San Diego. While in San Diego, Christian and Estelle visited the Scripps Clinic. Two doctors at the clinic examined Estelle and noted that she was, "clearly aphasic and is unable to both understand commands and to express herself." Finding of fact 43, CP at 2319. These doctors confirmed the course of treatment that had been prescribed for Estelle in Seattle. Christian and Estelle then returned to Seattle.
On October 16, 1995, a hospice nurse spoke to Estelle on the phone and noted that she was "not coherent and was using improper words." Finding of fact 44, CP at 2319. That same day, a letter was sent to the hospice bearing Christian and Estelle's signatures. It stated that Estelle felt "`wonderful'" and that the services of the hospice would no longer be needed. Finding of fact 45, CP at 2320. The following day, a hospice *760 supervisor telephoned Estelle and "noted that she was not tracking, and was perseverating and parroting." Finding of fact 44, CP at 2319. The hospice supervisor again informed Christian that if the health care power of attorney was not produced immediately, she would release Estelle's medical information to Estelle's family.
On October 17, 1995, Estelle's friend, Marcia Carlsten, arranged for her attorney, Kearney Hammer, to prepare financial and health care powers of attorney for Estelle in which Christian was named as her attorney in fact. Hammer delivered these documents to Estelle who signed them, despite experiencing difficulty placing her name, initials, and the date on the instruments. Carlsten witnessed the signing, and Lynch notarized her signatures on each document. Christian then announced to those in attendance that Estelle's brain cancer was in remission and that it was "`a miracle.'" Findings of fact 47, CP at 2320.
The following day, Dr. Klein, Estelle's neurosurgeon, met with Estelle and noted that she had trouble following simple commands. His notes also indicated that Estelle had additional cancerous tumors on the right side of her brain. A CT scan of October 31, 1995, showed a lesion on the right side of her brain. From that day through November 3, 1995, Estelle underwent a series of brain irradiations as treatment for the newly discovered tumors.
On or about November 3, 1995, Treadwell learned of the wedding in Las Vegas. He became concerned, and contacted Estelle to advise her that unless she changed her will, Christian would take a 75 percent share of her estate as an omitted spouse. A few days later, Treadwell sent Estelle a draft codicil to her 1993 will with a blank left in the document where she could insert the amount of the bequest she wished to leave to Christian.
In the meantime, Christian and Estelle had met with attorney Hammer to discuss revising Estelle's 1993 will. After the codicil prepared by Treadwell was received, it was forwarded to Hammer's office. Hammer then drafted a letter for Estelle to sign which indicated that she was dismissing attorney Treadwell and accountant Clements. The draft letter was sent to Estelle along with a newly prepared will which, if signed, would dramatically alter Estelle's estate planning in that it provided smaller sums to the persons who would have taken under her 1993 will, and made Christian the primary beneficiary of her large estate.
Estelle signed the letter prepared by Hammer on November 7, 1995. On November 14 she signed the will Hammer had prepared. Although Christian did not sign the will as a witness, he was present at its signing. Love noted that Estelle was restless and fidgety the day that she signed the will and could not sit still for more than five minutes. Hammer, on the other hand, indicated that he went over the will with Estelle "line by line." Finding of fact 62, CP at 2322. Copies of the letter discharging Treadwell and Clements were sent to each of them on the same day Estelle signed the will. Announcements of Christian and Estelle's wedding were then mailed to Estelle's friends and family.
On November 17, 1995, Janet Murphy called Estelle and spoke to Love. During their telephone conversation, Love "blurted out her concerns" regarding Christian and Estelle and told her of Christian and Estelle's plans to travel to Mexico in early December. Finding of fact 66, CP at 2322.
On November 21, 1995, Estelle's doctors concluded that Estelle had further brain metastases. Massive tumors on her spine and in her abdomen were also discovered. On that same day, following receipt of the letter discharging him as her counsel, Treadwell attempted to contact Adult Protective Services to report concerns he had about Christian and Estelle. He also spoke to Jim Murphy who then contacted Kenneth Schubert at the law firm of Garvey, Schubert & Barer regarding commencement of a guardianship proceeding.
On December 4, 1995, Treadwell and Murphy instituted a guardianship proceeding. Murphy also contacted Dr. Rieke who informed him that Estelle's trip to Mexico was medically reasonable, given the fact that she was terminally ill and the trip was very important to her. Rieke indicated that the *761 trip would give Estelle a much needed psychological lift. On that same day, Treadwell and Murphy sought a restraining order in the guardianship proceeding in order to prevent Estelle from leaving the country. Hammer appeared at this proceeding purporting to represent Estelle. Following a hearing, a temporary restraining order was entered prohibiting Estelle from leaving the country until a guardian ad litem could be appointed to conduct an investigation into her competency.
Despite the existence of the restraining order, Estelle and Christian flew to Mexico on December 5, 1995. During the course of this trip, Christian videotaped some of Estelle's activities. The videotape revealed that Estelle was tired, ill, and annoyed with Christian's questions to her regarding her appetite, competency and willingness to be in Mexico.
A guardian ad litem was appointed for Estelle on December 14, 1995. The court also suspended Hammer from representing Estelle until the guardian ad litem could interview her. Estelle was interviewed by the guardian ad litem on December 18, 1995, the first business day after her return from Mexico. During this interview, Estelle was asked if she had retained counsel for the guardianship proceeding. She responded that she had retained no one after Treadwell and that she was going to represent herself.
On December 20, 1995, Estelle began to hemorrhage internally and was taken to the hospital. She died on December 22, 1995, at the age of 64.
The will that Estelle executed on November 14, 1995 was thereafter admitted to probate. Jim Murphy, Estelle's surviving siblings and three of her nieces filed a petition in King County Superior Court contesting the validity of her 1995 will and her marriage to Christian. At the lengthy bench trial which ensued, 165 exhibits were admitted into evidence and over 30 witnesses testified. Among the witnesses were several medical experts who testified about Estelle's cognitive functions from July through December 1995. One of these witnesses, Dr. Capwell, was asked to review Estelle's medical records, videotapes of Estelle, the testimony of Dr. Rieke, Donna Love's logbook, the hospice notes, and declarations of other persons. He concluded that Estelle's cognitive impairment was significant, and that due to the effects of cancer, she was vulnerable to undue influence. Insofar as her capacity to understand the significance of the October 11 ceremony in Las Vegas, Dr. Capwell said, "I came very close to being absolutely certain that she could not understand in any way or comprehend what was happening, let alone what the meaning or significance of that was." Report of Proceedings at 1315.
At the conclusion of the trial, the trial court made extensive findings of fact and concluded that Estelle's 1995 will was procured by fraud and undue influence and that her marriage to Christian was void due to lack of solemnization, Estelle's incompetence at the time of marriage, and "exceptional circumstances indicating fraud of the grossest kind." Conclusion of law 21, CP at 2330. The trial court also concluded that Estelle was unable to ratify the alleged marriage because "her competence to do so was not evidenced at trial and because she remained under the undue influence of Lint until her death." Conclusion of law 24, CP at 2331. Christian sought review by this court, and we granted his petition.
The issues before us are these:
I. Do the trial court's findings of fact survive Christian's challenge?
II. Is there clear, cogent, and convincing evidence supporting the trial court's conclusion that Estelle's will was procured by undue influence and fraud on the part of Christian?
III. Did the trial court have jurisdiction, following Estelle's death, to declare Christian and Estelle's marriage invalid?
IV. Was there sufficient evidence to support the trial court's determination that the marriage was not solemnized and that there were exceptional circumstances indicating fraud of the grossest kind?

I. The Trial Court's Findings of Fact
Christian assigns error to all or part of 32 of the trial court's 82 findings of fact. Although he asserts that the assailed findings *762 are not supported by substantial evidence, his counsel's presentation in his brief consists almost entirely of a statement of facts setting forth the appellant's version of the facts in substantial detail. Suffice to say that this statement of facts varies in significant respects from the facts found by the trial court. Indeed, counsel for respondent characterizes the statement as "a recital of evidence that the trial court heard and rejected." Br. of Resp'ts at 1.
In support of his challenge to the trial court's findings, counsel for appellant opines that the trial court's findings are skewed by what counsel describes as the trial court's apparent "degree of prejudice [against] [a]n older woman [having] a meaningful relationship with a younger man." Appellant's Reply Br. at 24. Significantly, in the argument portion of his brief, appellant's counsel makes reference to only three of the trial court's findings of fact by number and he cites to relevant parts of the record in support of his argument against only two of the trial court's findings, findings 21 and 82.[3] As a general principle, an appellant's brief is insufficient if it merely contains a recitation of the facts in the light most favorable to the appellant even if it contains a sprinkling of citations to the record throughout the factual recitation. It is incumbent on counsel to present the court with argument as to why specific findings of the trial court are not supported by the evidence and to cite to the record to support that argument. See RAP 10.3. For the most part counsel has not done this.
Strict adherence to the aforementioned rule is not merely a technical nicety. Rather, the rule recognizes that in most cases, like the instant, there is more than one version of the facts. If we were to ignore the rule requiring counsel to direct argument to specific findings of fact which are assailed and to cite to relevant parts of the record as support for that argument, we would be assuming an obligation to comb the record with a view toward constructing arguments for counsel as to what findings are to be assailed and why the evidence does not support these findings. This we will not and should not do.
As noted above, appellant does assail the trial court's findings of fact 21 and 82 and he cites to portions of the record in support of his argument. In those findings, the trial court indicated that the degree of Estelle's receptive aphasia (impaired comprehension) was "clearly and persuasively" described by Dr. Capwell who, the trial court found, relied on mental status tests that Estelle failed. Appellant does not suggest that Dr. Capwell did not so testify, but merely points out that Dr. Capwell's testimony was refuted by Christian's expert witnesses. As respondents correctly point out, where there is conflicting evidence, the court needs only to determine whether the evidence viewed most favorable to respondent supports the challenged finding. Miller v. Badgley, 51 Wash. App. 285, 753 P.2d 530, review denied, 111 Wash.2d 1007 (1988). Viewing the evidence in that light we can say that the findings survive challenge. We, therefore, consider these findings and the others, all of which were either not challenged or were challenged improperly, as verities.

II. Estelle's 1995 Will
Christian contends that the trial court erred in declaring Estelle's will null and void on the basis that it was procured by undue influence and fraud. Although the existence of either fraud or undue influence justifies invalidation of a will, we will discuss each ground separately.

A. Fraud
Pursuant to RCW 11.24.010, a person interested in a will may, within four months following probate of the will, petition a court having jurisdiction and claim that the *763 will was procured by fraud. If it can be shown that the will was induced by fraudulent representation of a person benefiting from the will, the will may be set aside. In re Dand's Estate, 41 Wash.2d 158, 247 P.2d 1016 (1952). All of the elements of fraud must, however, be shown by clear, cogent, and convincing evidence in order for the will to be set aside.[4]
The trial court concluded, following trial, that the respondents presented clear, cogent, and convincing evidence of all of the elements of fraud. It noted, in that regard, that Christian falsely represented to Estelle that "he loved her and was the one person who would care for her because her family only wanted to put her in a convalescent home and get their share of her estate." Conclusion of law 2, CP at 2325.
Appellant asserts that a person's statements of love for another cannot be held to be a fraudulent misrepresentation because such a determination requires the trial court to plumb human emotions and make judgments about feelings that are entirely subjective. In approaching this issue, we acknowledge that the trial court's findings of fact strongly suggest that Christian's expressions of love for Estelle were less than sincere. It is readily apparent to us, furthermore, that the trial court's conclusion that Christian's representations of love were fraudulent was based in significant part on its finding that Christian was involved in a relationship with another woman as late as September 1995. Notwithstanding the considerable probative value of that finding, we are not satisfied that the findings of fact clearly, cogently, and convincingly justify a conclusion that Christian fraudulently represented that he loved Estelle. This is not to say that protestations of love cannot ever be held to be fraudulent. In certain circumstances they might well be considered fraudulent. If, for example, Christian had been overheard by someone admitting that he lied to Estelle about his feelings toward her, such a conclusion might well withstand a challenge that it was not supported by sufficient quantum of evidence. The trial court made no such finding, however, and we must conclude that absent evidence of such a compelling nature, a determination of fraud cannot rest on allegedly false representations of love.
We are satisfied, though, that the findings of the trial court clearly, cogently, and convincingly establish that Christian isolated Estelle from her family and friends, and, thereafter, falsely represented to Estelle that her family wanted to put her in a home in order to get their hands on her estate. The trial court was justified also in concluding that he made these representations in an effort to induce her reliance on him. We also conclude, as did the trial court, the culmination of this fraudulent enterprise was Estelle's signing of the will on November 14, 1995, an act which damaged Estelle in that it radically altered plans for the distribution of her estate that she had made at a time when she was not under Christian's influence.

B. Undue Influence
A will of a person who otherwise possesses testamentary capacity may be set aside upon a showing that a beneficiary exercised undue influence over the testator.[5]Dean v. Jordan, 194 Wash. 661, 79 P.2d 331 (1938). The undue influence which operates to void a will must be something more than mere influence but, rather, influence
which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.

*764 ... influence tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will.
In re Estate of Bottger, 14 Wash.2d 676, 700, 129 P.2d 518 (1942) (citations omitted). The evidence to establish undue influence must be clear, cogent, and convincing. In re Estate of Mitchell, 41 Wash.2d 326, 249 P.2d 385 (1952).
Despite the rather daunting burden that is placed on will contestants, a presumption of undue influence can be raised by showing certain suspicious facts and circumstances. This was noted and discussed by Justice Steinert in his scholarly opinion for this court in Dean where he said:
Nevertheless certain facts and circumstances bearing upon the execution of a will may be of such nature and force as to raise a suspicion, varying in its strength, against the validity of the testamentary instrument. The most important of such facts are (1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate. Added to these may be other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will....
The combination of facts shown by the evidence in a particular case may be of such suspicious nature as to raise a presumption of fraud or undue influence and, in the absence of rebuttal evidence, may even be sufficient to overthrow the will. In re Beck's Estate, 79 Wash. 331, 140 P. 340.
Dean, 194 Wash. at 671-72, 79 P.2d 331.
The existence of the presumption imposes upon the proponents of the will the obligation to come forward with evidence that is at least sufficient to balance the scales and "`... restore the equilibrium of evidence touching the validity of the will'; it does not, however, relieve the contestants from the duty of establishing their contention by clear, cogent, and convincing evidence." In re Estate of Smith, 68 Wash.2d 145, 154, 411 P.2d 879, 416 P.2d 124, 19 A.L.R.3d 559 (1966).
Although Christian concedes that the trial court properly employed the suspicion factors identified in Dean to find a presumption of undue influence, he contends that it went too far with the presumption and essentially transferred the burden of proof to Christian. This, he asserts, reduced the clear, cogent, and convincing proof requirement that should have been imposed upon the will contestants.
We are satisfied after viewing the trial court's findings of fact and conclusions of law that the trial court did not err in this regard. Rather it cited to Dean, and set forth the factors from the case that "`raise a suspicion, varying in its strength, against the validity of the testamentary instrument,'" and concluded, based upon the facts it found, that "[e]ach and every one of the suspicious factors enumerated in Dean is present in the instant case." Conclusions of law 3, 5, CP at 2326, 2327. It then went on to say that:
Given Estelle's mental and physical condition, the fatigue and fear associated with cancer, its treatment, and the knowledge that the disease was terminal; the near-constant presence of [Christian] and his friends that he hired to look after Estelle, to the exclusion of her friends and family; and the fact that Christian enlisted the assistance of a new attorney and fired Estelle's prior estate-planning attorney, this court finds that [Christian] exercised undue influence to override Estelle's estate plans.
Conclusion of law 9, CP at 2328.
While counsel for appellant correctly observes that the trial court did not indicate, as it did in concluding that Christian fraudulently induced the will, that there was clear, cogent, and convincing evidence to support its conclusion of undue influence, that conclusion seems implicit from its citation to Dean where the correct burden of proof is set forth. The implied conclusion also flows from the trial court's holding that clear, cogent, *765 and convincing evidence supported the conclusion that the will was procured by fraud. Fraud and undue influence, although distinct concepts, are closely related and the findings of the trial court that support its conclusion of fraud provide additional support for its conclusion that there was undue influence.
In sum, although the appellant did present evidence in an effort to rebut the so-called suspicion-raising factors, we are satisfied that the trial court's findings constitute clear, cogent, and convincing evidence of undue influence. Appellant concedes that Christian occupied a confidential and fiduciary relationship with Estelle and he does not argue against the trial court's determination that Christian had a "perfect opportunity for exerting undue influence." Conclusion of law 6, CP at 2327. Although appellant does claim that he rebutted the trial court's determination that he, in essence, procured the will by hiring Kearney Hammer to prepare Estelle's will and attending meetings where Hammer and Estelle discussed her new estate plans, we are satisfied that the trial court's findings support this conclusion. Christian's suggestion that Estelle's bequest to him in the will was not unnatural considering his deepening relationship with Estelle and the fact that he was her lover and husband, also does not stand up against the trial court's findings. Although we discuss below the validity of Estelle and Christian's marriage, it is apparent from the facts found by the trial court that Christian was not an object of Estelle's bounty in 1993 and only became so in 1995 as a consequence of his concerted efforts to isolate and estrange Estelle from her family and friends and to control every facet of her life. We are satisfied in the final analysis that there is clear, cogent, and convincing evidence in the record to support the trial court's conclusion that Christian procured Estelle's 1995 will by undue influence.

III. The Marriage
Our conclusion that Estelle's will was invalid because it was procured by fraud and undue influence does not entirely resolve this appeal. The invalidation of her 1995 will has no effect on her prior will which she executed in 1993. Because that will does not provide for Christian, as Estelle's surviving but omitted spouse, Christian would be entitled to receive an amount equal in value to that which he would have received if Estelle had died intestate. RCW 11.12.095. It is incumbent on us, therefore, to resolve the other major issue in this case: did the trial court err in concluding that Christian and Estelle's marriage was (1) voidable due to Estelle's incompetence at the time of its alleged occurrence, and (2) void ab initio due to lack of solemnization and exceptional circumstances indicating fraud of the grossest kind?
Appellant, supported by amicus curiae, asserts that the trial court lacked subject matter jurisdiction to determine the validity of the marriage and that the respondents had no standing to bring the proceeding. He bases his argument on the provisions of RCW 26.09.040, a statute first adopted by the Legislature in 1973 as a part of "a comprehensive revision of the laws of Washington concerning judicial termination of marriages." Br. of Amicus Curiae at 1-2 (footnote omitted). Appellant correctly observes that this statute provides, in pertinent part, that "[w]hile both parties to an alleged marriage are living, ... a petition to have the marriage declared invalid may be sought."[6] RCW 26.09.040(1).
Christian argues that this statute is the only source of a trial court's authority to declare a marriage invalid. That being the case, he opines, because Estelle was a party to the marriage and is no longer living, the trial court was without authority to declare the marriage invalid. Respondents' rejoinder to that argument is that the trial court *766 had authority that emanates from the common law to declare a marriage invalid in certain exceptional circumstances. They also assert that provisions of the aforementioned statute are not applicable in instances where the marriage did not come into being due to the fact that no marriage ceremony was performed.[7]
In support of this argument, respondents call our attention to In re Estate of Romano, 40 Wash.2d 796, 246 P.2d 501 (1952), a case in which the facts were somewhat similar to those present here. There, an elderly and infirm man, Leonard Romano, was inveigled by his housekeeper to fly to Las Vegas in order to get married. The couple went through a marriage ceremony in that city and then returned to Seattle. Two years later the husband died. Persons who would have taken under a will that the deceased had executed prior to his marriage sought to reestablish the will by having the marriage declared invalid. This court refused to allow a collateral attack upon the marriage on the basis that the grounds asserted for declaring the marriage invalid, lack of capacity and fraud in the inducement, only rendered the marriage voidable and not void. In reaching that decision, this court relied on the provisions of RCW 26.04.130, a statute that is still in effect. That statute provides that a marriage that comes about as a result of force or fraud may be invalidated but "only at the suit of the party laboring under the disability." Because Romano was dead, we concluded, the action was properly dismissed. We went on to say, however, that the rule against collateral attack would have no application "where the claim is made that no ceremonial marriage was performed." Romano, 40 Wash.2d at 806, 246 P.2d 501. We also observed that "[t]here are also cases where, under exceptional circumstances indicating fraud of the grossest kind, without apparent opportunity to detect or correct the inequity during the lifetime of the deceased spouse, a collateral attack after death has been permitted." Romano, 40 Wash.2d at 806, 246 P.2d 501.
As noted above, respondents assert that because the trial court found that no ceremony took place here and there was fraud of the grossest kind, a collateral attack against the validity of the marriage may be successfully mounted. Appellant argues in response that the statement in Romano upon which respondent's assertion is based was mere dicta since the Romanos had gone through a ceremony in Las Vegas and the husband lived for sufficient time after the marriage to allow a friend or guardian to maintain a direct attack on the marriage before his demise.
While we recognize that the above-quoted statement from this court's decision in Romano was not necessary to that decision, we believe that there is merit to the view this court expressed many years ago in Romano. In our judgment, RCW 26.09.040 has no application to a situation such as we have here where no marriage came into existence due to lack of solemnization or where gross fraud is present. In such cases, courts of this state should have and do have the inherent power to declare the alleged marriage void and of no force or effect. Our decision in this regard is buttressed by the fact that the grounds set forth in RCW 26.09.040 for declaring a marriage invalid do not specifically include lack of solemnization or exceptional circumstances indicating fraud of the grossest kind.[8] This strongly suggests, contrary to the argument of the appellant, that the Legislature did not intend to entirely occupy the field and abolish attacks upon a putative marriage that was not solemnized or was the product of fraud of the grossest kind.

IV. Ratification
As noted above, the trial court's findings of fact are verities. Those factual findings, which are summarized above, fully support the trial court's conclusion that no *767 ceremony of marriage took place here and that there were exceptional circumstances indicating fraud of the grossest kind. They also support its conclusion that there was no subsequent ratification of the marriage ceremony by Estelle because she remained under the influence of Christian until her death. Although appellant's counsel makes much of the fact that Estelle and Christian sent out notices of their wedding to friends and family and that Estelle told some people she was married, that evidence pales in comparison to the trial court's finding, albeit denominated a conclusion of law, that Estelle was incompetent at the time of the marriage and remained under Christian's influence during the brief time between her marriage and her death. In light of the trial court's findings, the trial court was fully justified in declaring the marriage invalid.

V. Conclusion
A long and bitter trial preceded the trial judge's decision in this case. During the course of it the respondents introduced evidence to establish that Christian took advantage of a woman whose body and mind were being ravaged by cancer and that he did so for material gain. On the other hand, appellant attempted to show that the respondents were merely greedy relatives whose interest in obtaining a share of Estelle's estate exceeded their concern for her well being. The experienced trial judge who heard this case observed all of the witnesses who testified and made detailed findings of fact at the conclusion of the trial. In order to do so he was called upon to judge credibility and weigh the probative value of the conflicting testimony. For reasons we have stated above, we accept the trial judge's findings of fact as verities and conclude that they support the conclusions of law made by the judge. We, therefore, affirm his ruling.
DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, TALMADGE and SANDERS, JJ., concur.
NOTES
[1] Aphasia is a loss or impairment of the power to use or understand words.
[2] Fenton worked for Christian at a company he owned called Yankee Enterprises, and Love had previously detailed boats for Christian.
[3] We note that in the statement of facts portion of his brief, counsel for appellant indicates that finding of fact 9 is "particularly confused" and that finding of fact 37 is contrary to the evidence. Appellant's Br. at 12 n. 9. Appellant did not, however, assign error to either of these findings. Appellant's counsel suggests in the argument portion of his brief that the trial court's finding of fact 5 is incorrect in that it implies that Christian took Estelle off her drugs in October 1995. Appellant's Br. at 66. Although he fails to cite to the record to support this assertion, we observe that this finding is borne out by the deposition testimony of Shirley Champoux. CP at 1284.
[4] The elements of fraud are: (1) representation of an existing fact; (2) materiality of the representation; (3) falsity of the representation; (4) knowledge of the falsity or reckless disregard as to its truth; (5) intent to induce reliance on the representation; (6) ignorance of the falsity; (7) reliance on the truth of the representation; (8) justifiable reliance; and (9) damages. Farrell v. Score, 67 Wash.2d 957, 958-59, 411 P.2d 146 (1966).
[5] Although the trial court rejected appellant's contention that Estelle lacked testamentary capacity at the time she signed the will presented to her on November 14, 1995, it ultimately determined that it was not necessary to reach a conclusion regarding testamentary capacity because the will was "null and void as the product of fraudulent misrepresentation and undue influence." Conclusion of law 11, CP at 2328.
[6] When RCW 26.09.040 was originally adopted in 1973, it contained the word "brought" instead of the present "sought." It is suggested that this change is significant. Indeed, amicus says "[t]he use of the word `sought' manifests the intent [of the Legislature] that a proceeding to attack the validity of the marriage may not continue if one spouse is deceased, irrespective of when the proceeding was commencedno one may seek to have the marriage declared to be invalid!" Br. of Amicus Curiae at 3-4 (footnotes omitted).
[7] Both Washington and Nevada require that marriages be solemnized by certain authorized persons. RCW 26.04.070; Nev.Rev.Stat. § 122.080 (1997).
[8] RCW 26.09.040 does, however, indicate that a marriage may be declared invalid for lack of capacity or mental incapacity. The trial court's conclusion that Estelle and Christian's marriage was voidable due to Estelle's incompetence at the time of marriage, therefore, is in error.