IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | No. 34419-3-III |
| | ) | |
| DENNIS OTTMAR, | ) | |
| | ) | UNPUBLISHED OPINION |
| Deceased. | ) | |
| | ) | |

PENNELL, J. — Days before his 2015 death in the intensive care unit of the

hospital, Dennis Ottmar executed a will leaving his estate to his wife, Elizabeth.[1] The

2015 will differed significantly from one that had been executed in 2005. The 2005 will

had divided Dennis's estate between Elizabeth and Dennis's son, Thomas. After

Elizabeth submitted the 2015 will for probate, Thomas filed a will contest. A trial was

held and the superior court judge invalidated the 2015 will on two bases: lack of

testamentary capacity and undue influence. Elizabeth now appeals. We affirm, as

substantial evidence supports the trial court's finding of undue influence.

## FACTS PRECEDING THE WILL CONTEST

*Dennis Ottmar's relevant personal history*

Dennis and Elizabeth were married in 1987. Both were previously married and

Dennis had one son, Thomas, from his first marriage. Dennis and Elizabeth purchased a

---

[1] For clarity and readability, first names are used to refer to those individuals
sharing the surname Ottmar. No disrespect is intended by doing so.

home in Spokane and lived there for the duration of their marriage. By all accounts, their marriage was a happy one. Dennis also maintained a good relationship with his son.

In 2005, Dennis retained his longtime attorney and friend, Byron Powell, to assist in the preparation of a will. With Mr. Powell's assistance, Dennis executed a will that divided his estate between Elizabeth and Thomas. In 2007, Dennis fell ill. Although there were periods of improvement, Dennis spent the rest of his life battling recurring health problems. Despite his ill health, Dennis never sought to change his will. Nor did he ever express concerns that his will might not adequately provide for his wife.

Dennis was an avid firearms collector and had amassed about 350 guns by the time of his death. In September 2014, Dennis became concerned about the possible passage of Initiative 594.[2] He worried the law would make the transfer of his firearms collection upon his death extremely difficult. Dennis inquired with an auction house about the possibility of selling his firearms collection, but no plan was ever finalized. While Dennis's concerns about Initiative 594 were well known to family and friends, there is no evidence indicating he believed passage of Initiative 594 would necessitate modifying the terms of his will.

---

[2] LAWS OF 2015, ch. 1 (Initiative 594, approved November 4, 2014).

2

No. 34419-3-III
*In re Estate of Ottmar*

*Events immediately preceding Dennis Ottmar's death*

Dennis suffered several serious medical issues during December 2014 and January 2015, and was admitted to the hospital for the final time on January 29. On February 6, the doctors told Dennis his illness was terminal and advised Elizabeth to get his affairs in order. To that end, Elizabeth placed a call to Mr. Powell. By the time of the call, Mr. Powell had retired from practicing law but he still maintained a close friendship with Dennis. Mr. Powell and Elizabeth offer differing descriptions of their phone call.

According to Elizabeth, she called Mr. Powell in order to obtain a copy of the 2005 will because she was unable to locate it.[3] Mr. Powell advised that he did not have a copy of the 2005 will because he was now retired. Elizabeth claims he further advised that there was a problem with the 2005 will that needed to be corrected.[4] Elizabeth asked Mr. Powell for the name of an attorney who could help fix the 2005 will, and Mr. Powell recommended Robb Grangroth. Elizabeth was unsure about using Mr. Grangroth and indicated she needed to speak with Dennis further.

According to Mr. Powell, there was no discussion of the 2005 will or any request for a copy during his phone call with Elizabeth. Elizabeth only expressed her opinion that

---

[3] Elizabeth was able to locate the 2005 will after Thomas initiated the will contest.

[4] Dennis never prepared a list of personal property pursuant to Section II(B) of the 2005 will. *See* RCW 11.12.260.

3

Dennis needed counsel for getting his estate in order, and Mr. Powell suggested Mr. Grangroth. Mr. Powell later testified that he had access to, and would have provided, a copy of the 2005 will if Elizabeth had asked for it.

Dennis and Elizabeth were neighbors with William Etter Sr., a local attorney. On February 8, Elizabeth approached Mr. Etter Sr., explained her situation, and asked if he could provide the name of an attorney who could help prepare a will. Mr. Etter Sr. recommended his son, William Etter Jr., because he did estate work. Mr. Etter Jr., operating under the assumption the 2005 will was lost, prepared a new will for Dennis at Elizabeth's direction. On February 9, Mr. Etter Jr. was ill and unable to go to the hospital for the execution of the 2015 will. Mr. Etter Sr. agreed to go to the hospital in place of his son, though he did not do so in the capacity of legal counsel. Mr. Etter Jr. never spoke with Dennis about his wishes for his estate, and never attempted to locate a copy of the 2005 will.

Mr. Etter Sr. arrived at the hospital on February 9 accompanied by a paralegal from his son's office. Dennis was in the intensive care unit at this point. When Mr. Etter Sr. entered Dennis's room, Dennis greeted Mr. Etter Sr. by name. Mr. Etter Sr. explained the purpose of his visit and he surmised that Dennis appeared alert and competent to execute a will. Elizabeth then read the terms of the 2015 will to Dennis. Dennis was

asked if he understood. He indicated he did. Dennis initialed each page of the will and then signed off on the document. After the will was signed and notarized,[5] Elizabeth had Dennis name her as the beneficiary on a retirement account. Under the 2005 will, the account was to be distributed equally to Elizabeth and Thomas.

According to medical records and testimony, Dennis's condition vacillated on February 9. By some reports Dennis was described as "alert," "oriented," and "conversant." Ex. P-1 at 16, 28. But other reports indicated Dennis was "somnolent," nonfocused, and unable to maintain a conversation. *Id.* at 23. A report prepared by the nurse who had witnessed the signing of Dennis's will stated that, by 4:04 p.m. that same day, Dennis was suffering from "Confusion/Disorientation/Impulsivity." *Id.* at 138.

Dennis's condition did not improve. On February 11, after making the decision to begin palliative care, Dennis called Thomas to speak with him, but Thomas could not understand what Dennis was saying so the call was very brief. Elizabeth was angry at Thomas for the short phone call so she texted him to ask if he understood Dennis was saying goodbye. Thomas indicated he did not understand that and asked if he could come to the hospital. Elizabeth stated he could not. Dennis refused all visitors during his time

---

[5] Mr. Etter Sr. and a hospital nurse signed as witnesses. The paralegal from Mr. Etter Jr.'s office notarized the document.

in the hospital and Elizabeth did not allow anyone but herself to be with him. On February 14, Dennis died.

## ANALYSIS

The trial court invalidated Dennis's 2015 will on two bases: lack of testamentary capacity and undue influence. Under our deferential standard of review, only one theory of invalidity must be supported by substantial evidence to affirm the trial court's judgment. *See In re Estate of Barnes*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016). As set forth below, substantial evidence supports the trial court's findings as to undue influence. Accordingly, we affirm the trial court's order invalidating the 2015 will without reaching the issue of testamentary capacity.

*The legal components of undue influence*

Undue influence is sufficient to void a will if it "'at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.'" *Barnes*, 185 Wn.2d at 10 (quoting *In re Estate of Lint*, 135 Wn.2d 518, 535, 957 P.2d 755 (1998)). A will contestant can proceed with his or her case by raising a presumption of undue influence. But despite the existence of the presumption, the will contestant retains the burden of proving the will's invalidity by clear, cogent and convincing evidence. *Id.*

6

Three factors, along with additional circumstances, can raise a presumption of undue influence: (1) the beneficiary had an opportunity for undue influence due to the existence of a fiduciary or confidential relationship, (2) the beneficiary's active participation in procuring the will supports finding the beneficiary caused undue influence, and (3) the resultant will is suggestive of undue influence, due to an unusually or unnaturally large bequest. *Id.* at 10-11.

Elizabeth claims the evidence presented at trial was insufficient to satisfy any of these factors. We disagree.

### *The opportunity for undue influence due to a fiduciary relationship*

The undisputed evidence at trial was that, during the weeks prior to her husband's death, Elizabeth was actively involved in all aspects of Dennis's financial and personal affairs. This evidence amply justified the trial court's finding that Elizabeth had a confidential and fiduciary relationship with her husband. *In re Estate of Haviland*, 162 Wn. App. 548, 559, 255 P.3d 854 (2011); *see Lint*, 135 Wn.2d 518.

### *Active participation in procuring the will*

Elizabeth was not just involved in her husband's general affairs, she was specifically involved in the preparation and execution of Dennis's 2015 will. It was Elizabeth who advised Dennis he needed a new will. She selected legal counsel and

dictated the new will's terms. The attorney who prepared the will consulted with Elizabeth, but not Dennis. And the attorney was not present for the will's execution.

The facts at trial were more than sufficient to justify the trial court's finding as to active involvement. While Elizabeth and Dennis may have been equal partners during the bulk of their 30-year marriage, this was not the applicable inquiry. The trial court properly focused on the narrow time period when Elizabeth procured the 2015 will for Dennis's signature. It was during this time that Elizabeth exercised active involvement. There is no basis for disturbing this finding on appeal.

*Unusually or unnaturally large bequest*

Elizabeth's close involvement with her husband's affairs and the steps she took to secure a will prior to her husband's passing are not, by themselves, unusual or suspicious. In a case such as this one, where one spouse is involved in wrapping up the other spouse's final affairs, the applicability of a presumption of undue influence turns largely on the third relevant factor—i.e., whether the size of the bequest was somehow "unusual" or "unnatural." *Barnes*, 185 Wn.2d at 13; *see Haviland*, 162 Wn. App. at 560 (recognizing importance of other factors given that spouses often play an active role in the preparation of a will). A will meets this criteria "'when it is contrary to what the testator, from his

8

known views, feelings, and intentions, would have been expected to make.'" *Barnes*,
185 Wn.2d at 14 (quoting *In re Estate of Miller*, 10 Wn.2d 258, 267, 116 P.2d 526
(1941)). Unusualness is typically measured by comparing the contested will "to the
decedent's previous testamentary instruments." *Id.* at 13.

Elizabeth claims the 2015 will was more natural than the 2005 will because it
provided a better account of her community property. Under the terms of the 2005 will,
which divided Dennis's property between Elizabeth and Thomas, Elizabeth asserts that
her interests in the home and other portions of her community property would be
negatively encumbered by Thomas's interests.[6] According to Elizabeth, in a longtime,
loving marriage such as hers, it is more natural to distribute an estate entirely to a
surviving spouse, regardless of the existence of children or other heirs.

Elizabeth's complaints about the 2005 will are not relevant to the issue before the
court. The question at trial was whether the 2015 will was contrary to Dennis's known
wishes. In 2005, Dennis made clear that he wanted to divide his estate between his wife
and his son. Prior to signing the 2015 will, Dennis never expressed any desire to change

---

[6] The 2005 will did not and could not strip Elizabeth of her community property
interests. Through the 2005 will, Dennis was empowered to bequeath only his separate
property and his portion of the community property .

course. While Dennis was concerned Initiative 594 would make it harder for his heirs to liquidate his firearms collection, there is no evidence this concern had anything to do with the terms of his will. Dennis may have wanted to auction off his firearms collection prior to his death in order to ease the burden on his heirs. But there is no evidence suggesting that Dennis also wanted the funds obtained from the disposition of his firearms to transfer solely to his wife.

At bottom, Dennis's 2015 will disinherited his son in favor of his wife, despite the lack of any evidence suggesting Dennis had experienced a change of heart. This kind of radical departure qualifies as "unnatural." We would be presented with a far different case if the 2015 will had made some provision for Thomas. But it did not. Given the stark differences between the 2005 and 2015 wills, the trial court was justified in finding the 2015 will an unnatural deviation from Dennis's prior intentions.

*Other factors*

In addition to finding the three core elements of the undue influence presumption, the trial court also found other factors justified invoking the presumption. Most importantly, the trial court found Dennis's physical and mental condition, days before his death, made him vulnerable to undue influence. There is sufficient evidence to justify this finding. Dennis was in pain, secluded in the intensive care unit, and knew he was not

going home. Regardless of whether Dennis lacked testamentary capacity,[7] the trial court had a sufficient basis for finding additional facts in support of the presumption of undue influence.

*The trial court had a sufficient basis to find undue influence*

Elizabeth challenges only the sufficiency of the facts supporting invocation of the presumption. She does not otherwise challenge the trial court's finding of undue influence. Our review indicates the trial court's ultimate determination of undue influence was supported by a sufficient factual record. *See Barnes*, 185 Wn.2d at 17.

## ATTORNEY FEES AND APPELLATE COSTS

Both parties have requested attorney fees and costs under RAP 18.1 and RCW 11.96A.150. Because Thomas has prevailed on appeal and has been awarded a portion of the estate, we grant Thomas's request for fees and costs but determine that the assessment shall be against the estate.

## CONCLUSION

It is undisputed that Elizabeth Ottmar was a devoted and loving wife. Given her

---

[7] By definition, a will contestant need not prove lack of testamentary capacity to establish undue influence. *Barnes*, 185 Wn.2d at 9 ("[A] will executed by a person with testamentary capacity may be invalidated if 'undue influence' existed at the time of the testamentary act.") (quoting *Lint*, 135 Wn.2d at 535).

No. 34419-3-III
*In re Estate of Ottmar*

long marriage to Dennis, it is likely Elizabeth genuinely believed she knew her husband's mind as well as her own and assumed he would want to leave behind a will less cumbersome than the 2005 document. But when it comes to someone who is ill and nearly incapacitated, love can sometimes have an undue influence. That is what happened here. The trial court's order revoking letters testamentary is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____        _____
Korsmo, J.                               Siddoway, J.

12