[No. 31352.   Department Two.   December 28, 1950.]

*In the Matter of the Estate of* BELLE CHAPMAN, *Deceased.*
OLIVER K. EMMONS *et al., Appellants,* v. TONY FREY, *Individually and as Executor, et al., Respondents.*[1]

*Parker Williams* and *Raymond C. Hazen,* for appellants.

*Clarence J. Coleman* and *Thomas G. McCrea,* for respondents.

HAMLEY, J.—This is a will contest. From a decision upholding the will, the contestants appeal, contending that the record establishes a lack of mental competence, and undue influence. The controversy centers around which of two properly executed wills is the last will of Mrs. Belle Chapman. She executed a will May 11, 1948, by which she left a trustee five thousand dollars for her son, if living, a life estate in a duplex to an old and trusted friend, Tony Frey, the remainder being equally divided between the American

[1] Reported in 225 P. (2d) 883.

Cancer Society and the Washington Children's Home Society. No question is raised as to her competency at that time, or as to the validity of that will, except the contention that it was revoked and superseded by a will executed July 12, 1948 (five days before her death at the age of seventy-six years). By the latter will, which is the contested one, she left five thousand dollars to her son and the rest of her estate to Tony Frey, Mary Peterson, and the latter's son, Carlyle Peterson, in equal shares.

Although Mrs. Chapman's son, Oliver K. Emmons, is named as a contestant, he receives the same amount under either will. The active contestants are the two societies named in the will of May 11, 1948, but omitted from the will of July 12, 1948.

Some reference to Mrs. Chapman's early history is essential to an understanding of the present circumstances. When quite young, she married Thaddeus Emmons, and a son, Oliver K. Emmons, was the issue of that marriage. When the boy was five years old, she left her husband, leaving the child, whom she never saw again, with Mr. Emmons' parents. The trial court, in its very complete and very able memorandum decision, said:

" . . . It should be said at this point that the evidence does not warrant the conclusion that Mrs. Chapman was a heartless woman. She was evidently quite young at the time she left Mr. Emmons and did not feel that she could take care of the small boy. Mr. Emmons' parents were good people and after leaving and securing a divorce, she evidently put her whole previous life behind her and commenced anew at the time she married Mr. Chapman. She kept the secret of the birth of this son locked in her heart until a few months before her death."

(Other quotations from the memorandum decision will be indicated by quotation marks without further reference to the source of the quotation.)

Mrs. Chapman thereafter married Mr. Chapman, with whom she lived until his death in 1917. Mr. and Mrs. Chapman lived in eastern Washington for many years. During this time they became acquainted with William C. Losey, a

member of the Spokane bar. This acquaintance went beyond a professional relationship, and Mr. Losey became a close personal friend of the Chapmans. As will appear later, it was Mr. Losey who came to the aid of Mrs. Chapman in the last months of her life, and who prepared the May 11th will, which the contestants contend has never been revoked.

Because of their being named as beneficiaries in the contested will, consideration should also be given to the relationships between Mrs. Chapman and Tony Frey, Mrs. Mary Peterson, and Carlyle Peterson. Mr. Frey became a friend of the Chapmans when they lived in Grant county, and he worked for them on a cattle ranch there. After Mr. Chapman's death, he became an invaluable aid to Mrs. Chapman and did much of the work around the apartment house which she owned and operated in Everett.

After coming to western Washington, Mr. and Mrs. Chapman became acquainted with a Mr. Peterson and his wife, Mrs. Mary Peterson, one of the beneficiaries under the will. The Petersons, in fact, were apparently Mrs. Chapman's oldest friends in this part of the state. Mr. Peterson had operated a store for Mr. Chapman at Milltown, and Mrs. Chapman had visited the Petersons there. The Petersons later moved to Stanwood and Mrs. Chapman took up her residence in Everett. Mrs. Peterson and Mrs. Chapman visited back and forth for a period of thirty years, continuing up to the time of Mrs. Chapman's death.

Mrs. Chapman became devoted to Mrs. Peterson's young son Carlyle, and he called her "Grandma Chapman." As a small boy he visited her frequently with his mother. As he grew to young manhood his visits became fewer, and stopped after he entered the army and later married. Nevertheless, Mrs. Chapman continued her interest in him.

All of the beneficiaries in the contested will were, it would appear, proper recipients of Mrs. Chapman's bounty, and there is nothing surprising about their inclusion in her will.

We turn now to a consideration of Mrs. Chapman's physi-

cal and mental condition prior to and at the time of the execution of the contested will.

She had successfully managed the apartment house after her husband's death, and was thoroughly alert and competent until she suffered a cerebral hemorrhage in June, 1947.

" . . . For two years previous to that she had been suffering from high blood pressure and hardening of the arteries and had sought medical advice from Dr. Geo. K. Moore. After the cerebral hemorrhage of June, 1947, her power of speech was seriously affected. This gradually cleared up and her friends could notice little impediment in her ability to speak up until the time of her last heart attack on July 2, 1948. . . .

"On December 30, 1947, Mrs. Chapman executed a will, which will was prepared by Arthur M. Newton, a lawyer of Everett, Washington. By this will she gave Mr. Frey a life estate in a duplex and left him outright the furniture and furnishings in that property and any other furniture he desired from the apartment house. She made a specific bequest of certain real estate to the Washington Children's Home Society of Seattle, Washington; left some real estate to Carlyle Peterson, son of Mary Peterson, and made Mary Peterson residuary legatee. Mr. Frey was appointed executor."

None of her friends knew that she had a son, and she did not disclose that fact to Mr. Newton when the December 30, 1947, will was prepared. At that time she made several trips to his office and showed a complete understanding of her affairs.

It is significant that in that will she made provision for Mr. Frey and Mrs. Peterson and her son Carlyle, who are also beneficiaries under the contested will.

That will also contained a devise of certain real property to the Washington Children's Home Society. The record shows cash contributions made by her almost every year from 1927 to 1946, to that society, probably prompted by the fact that she could make no gifts to her own son.

In May, 1948, about two months before her death, Mr. Losey received an almost unintelligible note from Mrs.

Chapman. Greatly concerned about her well-being, he came to Everett from Spokane to see what he could do for her. He

" . . . noticed some deterioration in her condition from his previous contacts with her, but after the lapse of a few days he found her to be alert and entirely competent. . . . At that time he went over Mrs. Chapman's papers and advised her regarding her property. On this visit, Mrs. Chapman first disclosed to Mr. Losey that she had a son born to her, whose whereabouts she did not know."

He advised Mrs. Chapman of the necessity of making a new will, and, as they had no way of knowing whether the son was still alive,

" . . . she left $5,000.00 in trust with the executor for a period of ten years to be paid to the son, if he could be found. She gave Mr. Frey a life estate in the same property mentioned in the will of December 30, 1947, as well as the personal property mentioned in that will. She left nothing to Mrs. Peterson or her son, Carlyle. The bulk of the estate was left by a residuary clause to the American Cancer Society and the Washington Children's Home Society, share and share alike. The Everett Trust and Saving Bank was appointed executor."

In less than two months after the execution of this will, to wit, July 2, 1948, she suffered a severe heart attack. She was immediately hospitalized and died fifteen days later. Five days before she died she executed the will around which the controversy is waged.

Subsequent to the May 11th will and prior to her heart attack, Oliver K. Emmons had been located in New York; and, although she had not seen him, she was convinced that he was her son.

We come now to the evidence bearing on the crucial question of her competency at the time the contested will was executed.

Dr. George K. Moore, who had been Mrs. Chapman's physician since his return from military service in 1945 (and to some extent before he went into the service), diagnosed her condition as senile dementia due to arteriosclerosis. On all his visits to the hospital he found her irrational

and unable to recognize him a great deal of the time. She was incontinent both as to bowels and bladder. He believed that any lucid intervals were mere flashes and did not reflect the possession of any reasoning power on her part. He testified that she never could have rallied in her last days in the hospital sufficient to have executed a will, although he was not present when the will was executed.

Dr. J. W. Ebert, testifying in response to a hypothetical question which stated the facts relative to her physical condition, did not find much evidence of senile dementia. He felt that her comatose condition and irrational behavior in the hospital could be accounted for by her severe illness, high temperature, heart condition and general weakness. It was his opinion that it was possible that she had had lucid intervals while in the hospital.

We are impressed, as were Dr. Ebert and the trial court, with the lack of evidence of progressive mental deterioration, with which senile dementia cases are usually replete. Witnesses who talked with Mrs. Chapman during the week before and up to the day before her heart attack and final hospitalization, testified that she was entirely normal.

It appears that even Dr. Moore thought at one time that Mrs. Chapman might become able to make a will while she was in the hospital, as he testified that he told Mr. Frey that she probably would not live and that a will should be made if her condition should become such that it would be possible. It was the doctor's understanding that he was to call Mr. Newton, or Mr. Newton was to call him in such a contingency.

Mr. Frey asked the nurse who was most constantly in attendance, Mrs. Jo Ann Watters, to notify him whenever she believed that Mrs. Chapman was in condition to make a will. Mrs. Watters testified that she called Mr. Frey (apparently about five p. m.) on July 12, 1948, and that he said he would arrive with Mr. Newton to draw the will. Mrs. Peterson, who had called at the hospital to see Mrs. Chapman, and Mr. Frey were present when Mr. Newton arrived. The latter asked Mrs. Watters if it would be all right if he

went in and talked to Mrs. Chapman about a will, and Mrs. Watters said yes. When he went into the room, accompanied by Mrs. Peterson and Mr. Frey, Mrs. Chapman greeted Mr. Newton by name.

The trial court adopted Mr. Newton's version of what transpired thereafter. He testified that, after Mrs. Chapman gave him a firm handshake, he said: "Well, you are ill and in bed and to get right to the point I understand that you want to make a new will." Although she told him that she did want to make a will, there seemed to be considerable hesitancy on her part in telling him just what she wanted done with her property. We quote a portion of Mr. Newton's examination:

"Q. Then what was said next? A. I think the next statement was made, I said, 'Mrs. Chapman, I understand that there is some man writing to you who claims to be your son.' Q. And did she make any response? A. She said, 'I am sure it is my son.' Q. Did she indicate anything about what she wanted to do for him? A. I asked her what she wanted to leave to the son and she said, 'I want to leave him five or six thousand dollars,' and I said, 'It has to be definite. Which will it be, five or six thousand?' and she says, 'It's five thousand cash I want left to him.' "

It is important to note that, when Mr. Newton first entered the room, he was under the impression that she probably wanted to restore the will that he had previously drawn, and he proceeded to call to her mind as much of that will as he could remember. Thus, he suggested to her that the Washington Children's Home Society had been one of the beneficiaries in the earlier will, but she said, "Things are changed. I don't want to leave them anything" (probably referring to the fact that she was now satisfied that her own son was alive). Remembering that she had left Tony Frey a life estate in her duplex and Mary Peterson and her son Carlyle something in her previous will, Mr. Newton asked her about them and if she knew who they were. At this point she nodded to Mr. Frey and Mary Peterson and smiled. We quote Mr. Newton's testimony after that point:

"I asked her then if there was anybody else she wanted to leave anything to and she said 'No', and then I said, 'Well, you have given me your son for five thousand dollars and you have given me the three names but you haven't told me how you want it left' and she said, 'I want it left to the three', and I said, 'How do you mean?' She said, 'I want to leave it to the three, just the three' and I can't tell you whether I put in the 'equally' or whether she did, but she agreed that she wanted to leave it equally to the three. That was different entirely than the first will that I had drawn, as I recall, but that was what she expressed to me."

Following this, an incident occurred which indicated that Mrs. Chapman not only knew what she wanted, but did not intend to be influenced away from what she had decided. In the words of Mr. Newton:

". . . Before I sat down to write that will [he had been taking notes up to that time], Mrs. Peterson came from the back of the room and in some term like 'Honey' said, 'Don't you think that we should—that you should put Oliver's name just in with the three of us so we would all share equally?' and Mrs. Chapman flared up and says, 'I don't want him having any buildings. I want him to have cash' and Mrs. Peterson retired to the back of the room."

After Mrs. Chapman rejected Mrs. Peterson's suggestion, no further attempt was made to change her mind.

Mrs. Chapman had been taken out of an oxygen tent during her conversation with Mr. Newton, but was placed back in the tent while Mr. Newton was drafting the will in longhand. When the will was completed, the front of the tent was rolled up and he began to read the will to her. She was alert when he started his reading, but as he got toward the end of it she closed her eyes, and he informed her that she would have to listen and be sure the will was as she wanted it. Again we quote his testimony:

". . . Mr. Frey reached in and kind of brushed her under the chin with the backs of his fingers—the backs or fronts, and she smiled and she opened her eyes and then I started at the paragraph where the bequest was left to the son and I read every word of that will to her from that point on the second time, and then I had asked—prior to that I had asked the nurse, Miss Watters, if she would act as a

witness and she said she would, and then I asked Mrs. Chapman if she would like to have me and the nurse be the witnesses to the will and she said she did."

Following the reading of the will, Mrs. Chapman's glasses were secured for her and she shakily wrote part of her signature with Mr. Newton's pen, which went dry before she could finish. Another pen was then supplied and the nurse guided her hand as she signed her name.

There is some conflict in the testimony as to whether she saw the witnesses sign the will. The trial court accepted Mr. Newton's testimony that she did watch them sign. The other witness to the will was the nurse, Mrs. Watters, who had notified Mr. Frey that Mrs. Chapman might be able to make a will and who had told Mr. Newton that it was all right for him to go in and talk to her about a will.

When the will was offered for and admitted to probate, Mrs. Watters was examined in some detail concerning the circumstances of the execution of the will, and she then testified that Mrs. Chapman was rational. At the time of the will contest, she testified that, by the word "rational," she meant only that Mrs. Chapman was aware of her surroundings. She further testified in the will contest that, in her opinion, Mrs. Chapman did not then have the mental capacity to understand ordinary business matters. This somewhat unconvincing explanation of her previous testimony that Mrs. Chapman was rational when the will was executed was not, in the opinion of the trial court or this court, an adequate counterweight to the testimony of Mr. Newton. In *In re Jaaska's Estate*, 27 Wn. (2d) 433, 443-4, 178 P. (2d) 321, we accepted as convincing the testimony of a subscribing witness who repudiated her prior testimony in support of a will, but under conditions quite dissimilar from those in the present case.

There is no other testimony concerning Mrs. Chapman's competency to make a will at the time the will was actually executed. However, there is testimony that there were periods during her stay in the hospital when she was entirely rational. One nurse testified that Mrs. Chapman had ra-

tional and lucid periods in which she made inquiry as to the condition of things at home, and about papers in her purse. As the trial court stated, "Mrs. Rosquist [the nurse] left the impression that she believed Mrs. Chapman was competent at times."

Other nurses also testified to the effect that they believed Mrs. Chapman was incompetent to make a will at all times that they observed her in the hospital. However, they also recalled incidents which indicate that there were periods when she was rational and had possession of her reasoning powers.

■ This, we think, is peculiarly a case in which the trial court's findings should not be disturbed. The statement appearing in law point No. 5 in *In re Martinson's Estate*, 29 Wn. (2d) 912, 920, 190 P. (2d) 96, is particularly apropos as expressing our views in the present case.

■ There is nothing in the disposition of Mrs. Chapman's property which indicates any lack of mental competency or undue influence. All the beneficiaries, as we have seen, had been named in a prior will or wills. We could, by substituting Mrs. Chapman for Mrs. Chapin, and Frey for Sweitzer, reiterate what we said in the final paragraph of law point No. 1 and in law point No. 2 in *In re Chapin's Estate*, 17 Wn. (2d) 196, 208, 135 P. (2d) 445. If the circumstances were such as to raise a presumption of fraud and undue influence under the conditions referred to in *Dean v. Jordan*, 194 Wash. 661, 79 P. (2d) 331; *Foster v. Brady*, 198 Wash. 13, 86 P. (2d) 760; and *In re Jaaska's Estate*, *supra* (and we say *if* the circumstances were such), the proponents of the will have come forward with evidence sufficient to balance the scales and convince the trial court and this court that there was no fraud or undue influence, and that Mrs. Chapman was competent to make a will when she made the one under attack.

The contestants asked for a new trial because of newly discovered evidence concerning a will executed by Mrs. Chapman in April, 1947, by which she left everything to the Washington Children's Home Society, and because of the

admission of certain testimony of the beneficiaries under the contested will. The contestants say that portions of the testimony of the beneficiaries, admitted over objection, relate to transactions with the decedent; while the proponents of the will say that none of the testimony involved such transactions.

We do not need to determine that question. Had the evidence objected to been excluded, and had the newly discovered evidence been admitted, the result, in our opinion, would not have been changed. Hence, it was not error to deny the motion for a new trial, and the error, if any, in admitting the challenged testimony, was not prejudicial. We can make the foregoing statement with more certainty than is usually possible, because the crucial question was the competency of Mrs. Chapman to execute a will between five p. m. and six-thirty p. m. on July 12, 1948. The evidence which the contestants contend should not have been admitted has little, if any, bearing on that question, nor does the evidence that they urge as being newly discovered.

The judgment is affirmed.

ROBINSON, MALLERY, GRADY, and HILL, JJ., concur.