IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Estate of:<br><br>MICHAEL E. WALTERS,<br><br>                Decedent.<br><br>TERI BEEDE,<br><br>                Appellant,<br><br>v.<br><br>NICHOLAS ALDRICH, SR, individually, and as Personal Representative of the Estate of Michael E. Walters; and the marital community comprised of NICHOLAS ALDRICH, SR and JEANNE ALDRICH,<br><br>                Respondents. | No. 86635-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Michael Walters died and left his home to Nicholas Aldrich, Sr. through his will. Teri Beede, Walters's sister, filed suit against Aldrich individually and as personal representative of Walters's estate, claiming, among other things, that Walters's will was invalid due to undue influence. Beede appeals the trial court's order granting summary judgment dismissing her claims. She also challenges the trial court's partial grant of attorney fees. Both parties seek attorney fees on appeal. We affirm the trial court's dismissal of Beede's claims and deny both requests for appellate attorney fees.

FACTS

Michael Walters was the third of five siblings: Sandee, Karen, Michael, Teri, and Bobby. By 2004, three of the siblings had passed. The two remaining siblings, Walters and Beede, had a closer relationship when they were younger, including throughout Walters's first marriage during the 1980s to 1990s.[1] However, after 2012, when their mother died, their relationship was not as close. They did not see each other in person frequently, and they would speak on the phone "[a] couple times a year."

Walters's primary asset was a single family residence in Mountlake Terrace, Washington (the "Property"). Walters executed a will naming Nicholas Aldrich, Sr. the sole beneficiary of Walters's estate. This will is the subject of the present lawsuit.

In early 2018, while Walters was a patient at Swedish Hospital Edmonds (Swedish), he met Aldrich. Aldrich worked as a Certified Nursing Aide (CNA) at Swedish and was 71 years old when they met. According to Aldrich, he cared for Walters several times and got to know him. During one of Walters's stays at Swedish, he shared with Aldrich that he had no relatives or friends. According to Aldrich, when he asked who picked up Walters's mail, Walters told him, "Nobody. It just piles up on the front porch." Aldrich then volunteered to collect his mail. According to Aldrich, the two developed a friendship, and he began visiting Walters to spend time with him and to help him with various tasks Walters could not accomplish on his own.

During one of these visits, Aldrich found Walters distraught. According to Aldrich, Walters had applied for a reverse mortgage on the Property, but the bank had declined

---

[1] Throughout Walters's first marriage, Beede and Walters were "close" and "spent a lot of time together," including going to concerts, and she attended every "special occasion or event that he had." Walters's second wife predeceased him in 2008. Walters did not have any children with either wife.

the application. Aldrich stated that "[t]o support [his] friend . . . , [he] promised to pay [Walters's] mortgage on the Property."

On March 6, 2018, Walters signed a quitclaim deed granting his Property to Aldrich. On April 11, 2018, Aldrich made his "first payment on [Walters's] mortgage for the Property, paid for 4 months of mortgage arrearage payments," and at the time of Aldrich's November 2023 declaration, "continue[d] to pay the Property mortgage to date."

On June 4, 2018, Walters executed a Last Will and Testament in which Aldrich was named the sole beneficiary of Walters's estate (the Estate). Aldrich was named the executor of the will, and Aldrich's daughter, Katherine Josee, was named an alternate executor. Josee and her husband served as witnesses to the will. Walters was 65 years old at the time.

In September 2018, a social worker at a rehabilitation center where Walters was staying at the time raised concerns about the transfer of Walters's Property to Aldrich, and a police investigation ensued. An officer for the Mountlake Terrace Police Department, Megan Johnson, first interviewed the social worker, who was concerned about perceived suspicious circumstances as well as the potential jeopardy to Walters's access to medical care through the State if he no longer had his house as a surety. Johnson then interviewed Walters, who confirmed he met Aldrich while he was treated at Swedish and that he transferred his home via quitclaim deed to Aldrich. This report was then forwarded to Adult Protective Services (APS).

In October 2018, APS began an investigation of a referral regarding Walters based on concerns of self-neglect.[2] The investigation concluded with a "Comprehensive Investigation Document" (Investigation Document) that substantiated the allegation. The Investigation Document confirmed that "health care professionals ha[d] informed [Walters] that an adult family home or assisted living facility is a recommended option for him because [Walters] need[ed] maximum assistance with his health care." However, "[b]oth [of] these options need financial resources which can be leveraged by [Walters] using his house to pay for [these] options." Upon realizing that Walters had transferred his home to Aldrich, according to the Investigative Document, "APS worked to reverse this transaction," so he could access care if he chose to. Sometime in November 2018, with APS support, Walters requested that Aldrich deed the Property back to him. On December 5, 2018, Aldrich transferred the Property back to Walters.

In March 2019, the Department of Health (DOH) also began investigating a separate complaint against Aldrich concerning unprofessional conduct as a CNA in violation of the statute regulating discipline of health professions, RCW 18.130.180(1) and (7).[3] On April 11, 2019, Aldrich was terminated from Swedish "due to [his] failure to comply with [Swedish's] Policies."

---

[2] The APS Comprehensive Investigation Document for this investigation defined "self-neglect" as alleged in the complaint as follows:

> "Self-neglect" means the failure of a vulnerable adult, not living in a facility, to provide for himself or herself the goods and services necessary for the vulnerable adults physical or mental health, and the absence of which impairs or threatens the vulnerable adult[']s well-being. This definition may include a vulnerable adult who is receiving services through home health, hospice, or a home care agency, or an individual provider when the neglect is not a result of inaction by that agency or individual provider.

[3] RCW 18.130.180 states in relevant part:

Until Walters's death in 2022, Aldrich and Walters continued to spend time together. Starting on April 17, 2019, Aldrich "arranged for [his] brother to clean [Walters's] windows and build a shed in the Property's backyard so [Walters] could store his stuff when he move[d] out to an adult family home." According to Aldrich, he also performed the following acts for Walters over the years:

> a. paid over $4,000 in arrears to bring Michael's Property mortgage current;
>
> b. paid over $59,000 of my personal funds towards Michael's mortgage on the Property from April 11, 2018 through August 6, 2022;
>
> c. continue to pay over $1,200 monthly towards Michael's Property mortgage with my personal funds;
>
> d. trimmed Michael's trees as required by Michael's insurance company;
>
> e. found an insurance company that would accept Michael;
> . . .
>
> f. paid for and built a shed in Michael's backyard for Michael to store his belongings;
> . . .
>
> k. loaned Michael $4,000 without interest, that Michael paid back;
> . . .
>
> o. paid Michael's $3,000 bail for Michael's DUI, took Michael to court, and paid for getting Michael's car out of police impound when Michael was cited with a DWI;

---

Except as provided in RCW 18.130.450, the following conduct, acts, or conditions constitute unprofessional conduct for any license holder under the jurisdiction of this chapter:

(1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not.
. . .
(7) Violation of any state or federal statute or administrative rule regulating the profession in question, including any statute or rule defining or establishing standards of patient care or professional conduct or practice; . . . .

p. loaned Michael $2,000 for Michael's attorneys' fees to defend against Michael's DUI . . . .[4]

Walters passed on July 28, 2022, and pursuant to his will, the court appointed Aldrich Personal Representative of the Estate.

On October 11, 2022, Beede filed a complaint under the Trust and Estate Dispute Resolution Act (TEDRA), ch. 11.96A RCW, seeking to invalidate the will on the grounds of undue influence and remove Aldrich as Personal Representative and asserting a claim of financial exploitation.[5] On February 14, 2023, Beede requested that the trial court order APS to release to her and Aldrich any confidential information APS held related to investigations regarding Walters. Instead, the trial court ordered the release of the information directly to it. On May 25, 2023, following an in camera review of the materials produced by APS (APS records), the trial court released 65 out of 301 pages.[6]

Aldrich filed a motion for summary judgment seeking dismissal of Beede's claims. After a hearing on the motion, the trial court granted summary judgment in favor

---

[4] Beede moved to strike certain testimony offered in Aldrich's motion for summary judgment and in his declaration in support of his motion for summary judgment based on RCW 5.60.030 (the "Deadman's Statute"). The trial court granted the motion in part, striking portions of the testimony offered in both documents. Despite this ruling, on appeal, both Beede and Aldrich cite to subsection (f) of Aldrich's declaration, which was stricken. The portions that were stricken are not part of the summary judgment record, and, accordingly, we do not consider them in our de novo review.

[5] Beede does not assign error to or discuss the trial court's dismissal of the financial exploitation claim. Because she fails to present argument or authority concerning the financial exploitation claim, the argument is waived. See Smith v. King, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986) ("The basis of this assignment of error is neither stated nor argued, nor is any legal authority bearing on that issue cited. Accordingly, we consider this assignment of error waived.").

[6] The APS records released by the court to the parties included redacted portions of three separate documents: (1) an Outcome Report based on a referral received on November 11, 2019; (2) notes from an interview of Walters by an APS social worker on May 29, 2018; and (3) the Investigation Document resulting from a referral received on October 30, 2018, which contains multiple entries from the course of the investigation from November 2018 through October 2019. Neither party raised any evidentiary objections to using these APS documents or to any evidence other than Aldrich's statements that Beede challenged under the "Deadman's Statute."

of Aldrich, dismissed Beede's claims, and, in a subsequent order, ordered Beede to pay $37,429.75 of Aldrich's fees and costs. Beede timely appeals.

DISCUSSION

Beede argues the trial court erred when it granted Aldrich's summary judgment motion and dismissed her claim for undue influence. She also challenges the trial court's partial grant of attorney fees after it determined she pursued the litigation in bad faith following the disclosure of portions of the APS records.

I.  Summary Judgment

We review de novo a trial court's order granting summary judgment, performing the same inquiry as the trial court. Gardens Condo. v. Farmers Ins. Exch., 2 Wn.3d 832, 838, 544 P.3d 499 (2024). A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). On summary judgment, the court "must consider all evidence in favor of the nonmoving party." Keck v. Collins, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015) (citing Young v. Key Pharm., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989)). When the moving party has shown an absence of an issue of material fact, the burden then shifts to the opposing party. Young, 112 Wn.2d at 225.

The right to dispose of one's property by will is a fundamental right assured by law. Dean v. Jordan, 194 Wash. 661, 668, 79 P.2d 331 (1938). A will is presumed valid if it is executed according to all legal formalities. RCW 11.24.030. However, "[a] will of a person who otherwise possesses testamentary capacity may be set aside upon a

7

showing that a beneficiary exercised undue influence over the testator." In re Est. of Lint, 135 Wn.2d 518, 535, 957 P.2d 755 (1998).

The person contesting a will has the burden of proof to establish the illegality of the will. Dean, 194 Wash. at 669. The evidence to establish undue influence must be clear, cogent, and convincing. Id. at 669, 671. Clear, cogent, and convincing evidence is evidence that makes the occurrence of a fact "highly probable." In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973).

"The general principles of summary judgment are supplemented by additional principles when a party claims undue influence." Kitsap Bank v. Denley, 177 Wn. App. 559, 569, 312 P.3d 711 (2013). The determination of undue influence is a mixed question of fact and law. Id. Indeed, "when reviewing a civil case in which the standard of proof is clear, cogent, and convincing evidence, [we] 'must view the evidence presented through the prism of the substantive evidentiary burden.' " Woody v. Stapp, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, we must determine "whether, viewing the evidence in the light most favorable to the nonmoving party, a rational trier of fact could find that the nonmoving party supported [their] claim with clear, cogent, and convincing evidence." Woody, 146 Wn. App. at 22.

" 'Undue influence' that is sufficient to void a will must be 'something more than mere influence but, rather, influence 'which, at the time of the testamentary act, controlled the volition of the testator, interfered with his free will, and prevented an exercise of his judgment and choice.' " Mueller v. Wells, 185 Wn.2d 1, 10, 367 P.3d 580 (2016) (internal quotation marks omitted) (quoting Lint, 135 Wn.2d at 535).

8

"Circumstantial evidence may be used to establish suspicious facts that raise a presumption of undue influence." Mueller, 185 Wn.2d at 10 (citing In re Est. of Martinson, 29 Wn.2d 912, 914-15, 190 P.2d 96 (1948)).

The three main "circumstances" that could raise a presumption of undue influence are "(1) that the beneficiary occupied a fiduciary or confidential relation to the testator; (2) that the beneficiary actively participated in the preparation or procurement of the will; and (3) that the beneficiary received an unusually or unnaturally large part of the estate." Dean, 194 Wash. at 672; see also Mueller, 185 Wn.2d at 10 ("The court in Dean identified certain suspicious facts and circumstances that could raise a presumption of undue influence."). Further, the Dean court identified "other considerations, such as the age or condition of health and mental vigor of the testator, the nature or degree of relationship between the testator and the beneficiary, the opportunity for exerting an undue influence, and the naturalness or unnaturalness of the will." Id. at 11. The weight of any factor will vary according to the circumstances of a given case. Dean, 194 Wash. at 672. "Whether the existence of the so-called Dean factors raises a presumption of undue influence is a highly fact-specific determination that requires careful scrutiny of the totality of the circumstances." Mueller, 185 Wn.2d at 11. "If the presumption is raised, the will proponent must produce evidence to rebut the presumption." Mueller, 185 Wn.2d at 10.

A. Evidence Establishing the Presumption of Undue Influence

Beede asserts that she established a presumption that Aldrich exercised undue influence over her brother. First, Beede contends that she demonstrated the first Dean factor, that Aldrich had a confidential relationship with Walters, through evidence that he

"gained the confidence of Walters by purporting to act or advise with his interest in mind, all while Walters was dependent on Aldrich and was emotionally and physically vulnerable."

"A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind." McCutcheon v. Brownfield, 2 Wn. App. 348, 357, 467 P.2d 868 (1970) (quoting RESTATEMENT OF RESTITUTION § 166 cmt. d (1937)). Other factors can be considered when determining whether a confidential relationship exists between parties, such as whether the testator lived with the beneficiary, was dependent on the beneficiary, or was emotionally or physically vulnerable. Kitsap Bank, 177 Wn. App. at 572. The crux of either a fiduciary or confidential relationship "is a level of trust that leads the testator to believe that the beneficiary is acting in [the testator's] best interests, creating an opportunity for the beneficiary to exert undue influence." Mueller, 185 Wn.2d at 11.

For example, in Kitsap Bank, the court concluded that the estate did not establish a confidential relationship between the decedent and beneficiary by clear, cogent, and convincing evidence. 177 Wn. App. at 573. The court acknowledged that the facts indicated the decedent considered the beneficiary "family" and "believed [the beneficiary] would act in her best interests," especially considering the decedent appointed the beneficiary attorney in fact. Id. But it reasoned that because the beneficiary was not in a particularly vulnerable state, either emotionally or physically, and that she "lived by herself and was capable of managing her affairs," these facts would not allow a rational trier of fact to find a confidential relationship. Id. Furthermore, it determined that although the two saw each other "regularly," they were together for

only brief periods of time, and they "watched television or talked about hobbies and mutual interests." Id.[7] Compare In re the Trust and Est. of Melter, 167 Wn. App. 285, 290-91, 273 P.3d 991 (2012) (confidential relationship existed because decedent lived with and was dependent on her son due to an inability to live by herself and was emotionally distraught following the death of her husband and daughter); In re Est. of Jones, 170 Wn. App. 594, 607-08 n.7, 287 P.3d 610 (2012) (confidential relationship assumed to have existed because decedent was dependent on her sons to run the family business and was in a vulnerable emotional state following the death of her husband).

Here, viewed in the light most favorable to Beede, the record suggests Aldrich and Walters shared a confidential relationship. Aldrich gained the confidence of Walters, and Walters believed Aldrich would act with his best interests in mind, as he progressively trusted him with tasks varying from day-to-day chores to major financial assistance.[8] The APS Investigation Document found that the allegations of self-neglect reaching back to May 24, 2018 were "substantiated." Aldrich was identified in various APS entries in the Investigation Document as Walters's friend and as the person to be informed when an AFH could accommodate Walters. The APS Investigation Document also identified multiple examples when Aldrich would assist Walters with various tasks, such as grocery shopping, collecting items from Walters's house while he was in the

_____

[7] The court also determined a rational trier of fact would not find a fiduciary relationship between the two, as the beneficiary was merely a teller at the decedent's bank. Kitsap Bank, 177 Wn. App. at 574. Additionally, there was no evidence that the beneficiary managed the decedent's accounts in a manner that would demonstrate the decedent would expect her to act in her best interests when managing her money. Id. at 574-75.

[8] Although on March 22, 2019, when asked by his doctor "if his DPOA [durable power of attorney] is Nick," Walters "responded yes," an APS entry from an August 28, 2019 meeting stated that according to a social worker, Walters "[did] not have a DPOA, but he does have a friend called Nick . . . ."

11

hospital, retrieving mail, providing rides to and from the hospital or secondary care facilities, picking up medication from the pharmacy, replacing Walters's broken dryer, and building him a shed to store his items. This dynamic is unlike the relationship in Kitsap Bank, where the decedent was not physically vulnerable, and the time she and the beneficiary spent together was frequent but brief and revolved around discussions of hobbies and interests.

Aldrich admitted to being a co-signor to one of Walters's bank accounts, although he denied ever writing any checks or withdrawing any money from this account. Aldrich also loaned money to Walters and offered to pay for his expenses, including a portion of Walters's adult family home (AFH) costs, for Walters's home to be cleaned and set up as a rental, and for Walters's bail when he was jailed. Further, during the police investigation of the house transfer, Walters had requested a lawyer to help with the transfer, and Aldrich told him they didn't need a lawyer. Nevertheless, Walters stated he felt comfortable about the transfer because he trusted Aldrich and did not believe he was attempting to take advantage of him. The first Dean factor supports the presumption of undue influence.

As to the second Dean factor, to determine whether overall, the beneficiary brought about or affected the testamentary instrument, courts consider the greater context of the relationship. Mueller, 185 Wn.2d at 12-13. For example, in Mueller, the court reasoned an act such as driving the decedent to meet with her attorney might not individually be sufficient, but taken together, there was evidence of "systematic manipulation" that demonstrated the "will would not have come into being" but for the beneficiary's actions, including that (1) the beneficiary was the sole means of

12

transportation and drove the testator to a series of meetings that resulted in the execution of the new will; (2) the beneficiary isolated the testator from her family by making numerous false statements about them; (3) the beneficiary misled other people around the testator that the disinherited parties were "greedy villains," and (4) the beneficiary changed the testator's calling plan, "making it difficult for family and friends to reach her by phone." Id.

Here, there is not the type of evidence as in Mueller that Aldrich engaged in "systematic manipulation" without which the will would not have come into being. However, for purposes of establishing the presumption of undue influence, even if Aldrich sought solely to assist Walters in carrying out his wishes, it is a reasonable inference that he assisted in bringing about the will. Beede relies on the first quitclaim deed, Walters's acknowledgment and subsequent denial of bequeathing his home without discussing Aldrich's involvement, the investigation letter from the DOH—which focused on the quitclaim deed—and Aldrich's response to that investigation. Aldrich and Walters had known one another for approximately only four months before Walters initially quitclaimed his Property on April 9, 2018.[9] APS records from November 7, 2018, relating to a claim that Aldrich personally and financially exploited Walters's state that according to Walters, one of Aldrich's children is a lawyer and assisted with his initially signing over his house to Aldrich. Two days after the quitclaim deed was entered, on April 11, Aldrich began making payments on Walters's mortgage and eventually paid over $4,000 in arrears to bring Walters's mortgage current. Although Aldrich denied any involvement with drafting Walters's will and could not recall the exact dates, timelines,

---

[9] It appears the date on the quitclaim deed was March 6, 2018, but it was not recorded until April 9, 2018.

or reasons for Walters's signing his will, Aldrich acknowledged that the witnesses to the will were his daughter and son-in-law and they became involved because Aldrich "asked them if they would witness the signing" and they agreed. Aldrich's daughter was also named as an alternative executor to the will. Thus, the second <u>Dean</u> factor supports the presumption of undue influence.

The third <u>Dean</u> factor asks whether the beneficiary received an unusually or unnaturally large portion of the estate. "Unusualness" or "unnaturalness" can be measured by comparison to the decedent's testamentary instruments, <u>In re Est. of Chapman</u>, 37 Wn.2d 682, 691, 225 P.2d 883 (1950), or bequests to other beneficiaries. <u>In re Est. of Malloy</u>, 57 Wn.2d 565, 570, 358 P.2d 801 (1961). The record does not indicate that there were prior testamentary instruments, so there is no helpful prior comparison. But Walters left the entirety of his estate to Aldrich after knowing him only for four months. Thus, Aldrich did receive an unusually large portion of the Estate. <u>Compare</u> <u>In re Est. of Smith</u>, 68 Wn.2d 145, 156, 411 P.2d 879 (1966) (holding bequest of 80 percent to testator's lifelong friend not unusual given the "canopy" of "love, affection, companionship, and a deep and abiding friendship extending over at least 57 years").

As for the additional considerations bearing on undue influence, the parties dispute the "naturalness or unnaturalness" of Walters's will. A will can be construed as unnatural when the beneficiary is not the "natural object" of a testator's bounty. <u>Mueller</u>, 185 Wn.2d at 14. Additionally, "[a] will is unnatural 'when it is contrary to what the testator, from his known views, feelings, and intentions would have been expected to make.' " <u>Id.</u> (quoting <u>In re Est. of Miller</u>, 10 Wn.2d 258, 267, 116 P.2d 526 (1941)).

Beede contends Aldrich was not the "natural object[] of Walters' bounty" as he was unrelated to Walters and the two met only four months prior to the execution of Walters's will. Beede relies on Mueller, where the trial court found the unnaturalness of the will to be a " 'critical factor' " in its decision. 185 Wn.2d at 14. There, the bequest was unnatural because the beneficiary was 51 years younger than the testator, was unrelated to the testator, and became consistently involved with the testator only in the last few years of her life. Id. In contrast, the family members challenging the will were the testator's closest living relatives and direct lineal descendants of the contested property's homesteaders, and they grew up near the testator and spent a significant amount of time with her up until the last few years of her life. Id. Those relationships diminished at the same time the testator and beneficiary met, and the will executed during the final years of the testator's life was a " 'radical departure' from her prior wills." Id. at 12-13.

Unlike in Mueller, where the testator's relationships with her family had been close but diminished after she met the beneficiary, here, even before the relationship with Aldrich developed, Beede was not closely involved in Walters's life. And on at least three different occasions during the APS investigation, Walters denied to others having any living family members. Mueller is also distinguishable because there, the trial court found the testator was " 'extremely vulnerable to undue influence due to physical limitations, [and] some degree of cognitive impairment,' " 185 Wn.2d at 14, whereas here, Beede presented no evidence that physical limitations rendered Walters completely isolated from others and dependent solely on Aldrich for care or that at the time the will was executed, Walters experienced cognitive impairment.

Nevertheless, viewing the record as a whole and considering the totality of the circumstances in the light most favorable to Beede, we conclude that the record includes facts and circumstances sufficient to raise a presumption of undue influence.

B.  Clear, Cogent, and Convincing Evidence of Undue Influence

"If the facts raise a presumption of undue influence, the burden of production shifts to the will proponent, who must then rebut the presumption with evidence sufficient to 'balance the scales and restore the equilibrium of evidence touching the validity of the will.' " Mueller, 185 Wn.2d at 15 (quoting Dean, 194 Wash. at 672). "However, the will contestant retains the ultimate burden of proving undue influence by 'clear, cogent, and convincing' evidence." Id. (quoting Dean, 194 Wash. at 671).

The presumption of undue influence is not sufficient to defeat a motion for summary judgment, Kitsap Bank, 177 Wn. App. at 578, nor is "mere suspicion of undue influence" enough. In re Est. of Mitchell, 41 Wn.2d 326, 353, 249 P.2d 385 (1952). "Rather, the contestant must establish undue influence by producing direct or circumstantial 'positive evidence.' " Mueller, 185 Wn.2d at 16 (quoting Dean, 194 Wash. at 673). Evidence supporting a presumption may also be considered as direct or circumstantial evidence of actual undue influence. Id. at 16-17 (trial court's extensive findings of fact established unrebutted presumption of undue influence which was later definitively established by "further positive evidence").

Generally, "[a] testator's strength of mind is obviously important evidence, bearing directly on the prospect that [their] free will was overcome, and is often noted when declining to find undue influence." Melter, 167 Wn. App. at 310. For example, in Kitsap Bank, the court determined that even if there was sufficient evidence to create a

presumption of undue influence, the presumption was effectively rebutted by a significant amount of evidence demonstrating that the testator acted independently at the time she designated her longtime friend as a beneficiary of her payable on death accounts. 177 Wn. App. at 578-79. Indeed, during that time, a third party had spoken to the testator twice, and each time the testator clearly stated her desire to leave her money to her friends rather than her family. Id. at 579. Furthermore, this same third party received written instructions from the testator corroborating this intent, and the third party confirmed these instructions with the testator, who appeared of sound mind. Id. The testator's attorney also testified that the testator "knew exactly what she was doing at the time she signed her new will and designated [the beneficiary] her attorney in fact." Id. By contrast, there was no evidence that suggested the testator was "incompetent or incapable of handling her own affairs." Id.

Here, while Walters needed significant assistance with his physical care, the presumption of undue influence was effectively rebutted by evidence that Walters was acting independently and exercised his judgment and choice when executing his will, as in Kitsap Bank. The APS Investigative Document describes multiple instances when Walters expressed reluctance about relinquishing his home to the State to access care and instead expressed a desire to gift it to Aldrich. For instance, Walters described the situation as "seems the government is saying, sell your house and we'll then help you out," and the Investigative Document states that Walters "is 'torn between giving his house to his friend and to [the] government." Although caretakers recommended Walters move into an AFH or Assisted Living Facility (ALF), the Investigative Document noted that

Both these options need financial resources which can be leveraged by [Walters] using his house to pay for the options. A) With the option of moving into a facility, [Walters] has been consistently hesitant, citing concerns about affordability. The information on the availability of government assistance through the COPES program, was given to [Walters] but on each occasion [he] declined to follow through with the program due to his reluctance or ambivalence to put up his house as surety for the State to recover the costs of his care.

Immediately after this section, the Investigative Document notes that "[Walters] had gifted his house to a friend so as to avoid giving his house to the State in exchange for long term health care. APS worked to reverse this transaction and still [Walters] declined to use his house to facilitate better care for himself." Even when Walters was provided with resources to explore renting his house or using the proceeds from selling the house to pay for his care, he "did not follow through on either of the possibilities and chose to go back to his home situation despite medical recommendations." Despite the concern associated with Walters's choices, the Investigative Document ended with the acknowledgement that "[Walters] is fully cognizant of how his refusal with his house impedes him from getting quality long term safe care; and how it also prolongs his exposure to situations that put his well-being at risk to adverse consequences." Furthermore, the Investigative Document noted that Walters's desire for long term care fluctuated depending on his current health status.[10]

Similarly, a narrative police report from the fraud investigation recounted a conversation with Walters in which he indicated his intent regarding the house:

[Walters] told me he did not have any family or friends to leave his house to in his will, so he told Aldrich he wanted to will the house to him. Aldrich told [Walters] they could just complete a qui[t] claim deed and transfer the house now instead of waiting. [Walters] requested they find a lawyer to

---

[10] Notes from a December 7, 2018 visit by a social worker to Walters's home also state that Walters "seemed to have [a] clear understanding about how the house ownership issue has significant bearing on whether he is able to get in an adult facility or not."

help with the transfer, and Aldrich said they didn't need a lawyer. [Walters] told me he does not feel uncomfortable about the transfer, and he trusts Aldrich.

By his words as well as actions, Walters conveyed a desire to remain in his home. While Aldrich's actions made it possible for Walters to do so, his assistance alone does not establish the will was the product of undue influence.

Despite the relatively short length of Walters's relationship with Aldrich at the time of the will, the ensuing friendship and financial support Aldrich provided for the remaining four years of Walters's life—in excess of $59,000—places his bequest in proper context.[11] Indeed, Aldrich recounted visiting Walters consistently, helping Walters maintain his home, loaning Walters money, and assuming Walters's mortgage so that Walters could remain in his home.

The rebuttal evidence showed Walters's desire to bequeath his property to his friend and caretaker, Aldrich. Beede has the burden of persuasion of showing Aldrich exerted influence that " 'controlled the volition of the testator, interfered with [their] free will, and prevented an exercise of [their] judgment and choice.' " Lint, 135 Wn.2d at 535 (quoting In re Est. of Bottger, 14 Wn.2d 676, 700, 129 P.2d 518 (1942)). "[M]ere suspicion, even when accompanied by opportunity and motive, is insufficient to raise a substantial inference of undue influence." Smith, 68 Wn.2d at 157 (quoting In re Est. of Hansen, 66 Wn.2d 166, 172, 401 P.2d 866 (1965)).

Neither party disputes that Walters's health was poor. In 2016, when Walters was admitted to Swedish Hospital, Swedish contacted Beede to sign papers on his behalf because, she was told, Walters was "too intoxicated to be able to represent himself."

---

[11] There are numerous occasions throughout the APS Investigative Document where Walters refers to Aldrich as his friend.

Beede was called two more times in the following months to visit Walters while he was in the hospital, once after a suicide threat and once for an embolism.[12] Walters was receiving services from a home care agency, and APS reported ongoing issues of self-neglect due to Walters's having the "physical and functional inability to care for himself." Additionally, a report from an APS field visit in June 2019, described Walters as "looking downcast" and recounted his desire at the time to move into an AFH or ALF because "he is feeling blue and cannot take living in his house alone anymore." When the APS investigator asked when Walters last ate, he responded that his last meal was "breakfast on 06/26," over a day prior.

A medical report from June 2022 suggested Walters had, at a minimum, some mental health conditions and possible impairment, including chronic alcohol abuse and dependence, anxiety, a long history of major depression, noncompliance with a treatment regimen from "3/22/19," panic attacks, self-neglect, and a "specific phobia." However, despite his history of alcoholism, depression, and anxiety, Beede does not provide evidence of cognitive impairment that made Walters vulnerable to undue influence regarding his testamentary intent. Beede relies on a narrative report of a call between an APS reporter and Walters in early September 2018 to support the assertion that Walters had some degree of cognitive impairment. However, the reporter stated only that Walters struggled with alcohol and was "often admitted to the hospital due to his alcohol abuse" and did not mention cognitive impairment.

---

[12] On at least one of those occasions, Walters requested Beede go to his house to retrieve items for him. When she visited Walters's home, she discovered an abundance of what she believed to be empty alcohol bottles, cementing her belief that Walters was struggling with alcohol addiction.

Further, unlike in <u>Lint</u>, 135 Wn.2d at 538, where the proponent of a will isolated the testator from others, here, despite a close relationship between Aldrich and Walters, Beede does not provide any positive evidence, direct or circumstantial, that indicated Aldrich isolated Walters from others or that the close relationship between the two prevented Walters from exercising his judgment and choice. The APS Investigative Document recognized that Walters was "fully cognizant" of the decisions he was making, and he repeated this desire to multiple parties over the following years. While Aldrich may have facilitated the creation of Walters's will, this facilitation was consistent with—not in contravention of—Walters's repeated desire to gift the property to Aldrich. And, although Aldrich received an unusually large portion of the Estate, in context, this was consistent with the friendship and robust support Aldrich provided to Walters in his final years of life.

Thus, in light of rebuttal evidence that indicated Walters acted independently and with intention when he gifted his home to Aldrich, Beede fails to overcome the substantial burden to show by clear, cogent, and convincing evidence that the will was the product of undue influence and not Walters's intent.[13] The court did not err in granting summary judgment in favor of Aldrich and the Estate.

---

[13] Beede further argues that Walters has no valid will. First, she asserts that because the will is the product of undue influence, it is void from the time of its execution. Second, she argues that the consideration of Walters's comments after the will was executed cannot be considered to "reform" or "ratify" his will, again assuming that undue influence draws into question the legitimacy of the will. Because we determine Beede does not meet her burden in showing by clear, cogent, and convincing evidence the will is a product of undue influence, this argument is unpersuasive. The comments are not considered to ratify the will. Rather, they corroborate and reinforce Walters's initial decision to gift his home to Aldrich.

II. Attorney Fees and Costs

Beede additionally challenges the trial court's order granting Aldrich attorney fees and costs. Both parties request attorney fees on appeal pursuant to RAP 18.1 as well.

A. Trial Court Fee Award

The court's order granting Aldrich's summary judgment motion also awarded him fees and expenses. Aldrich then submitted a fee request for $65,267.81 under TEDRA, RCW 11.96A.150. In response to Beede's argument that fees under RCW 11.96A.150 were precluded by the fee provision for will contests, RCW 11.24.050, the court held they were not, but regardless, "whether fees are ordered under RCW 11.96A.150 or RCW 11.24.050, the result is the same." The court then found that, although "at its outset, this action was taken in good faith," after undertaking discovery and reviewing the APS records, Beede no longer had probable cause to proceed, and "the continued litigation was not in good faith." Thus, the court granted fees and costs only for entries after the date of the APS record disclosure, but not "where they addressed a failure to timely bring a motion for protective order." The court also held that because both parties "prevailed somewhat" in the motion to strike, it halved the fee entries. Finally, the court held Beede was entitled to an offset for fees related to discovery in the amount of $6,885. Thus, the court granted Aldrich a reduced award of fees and expenses totaling $30,544.75.

We review a trial court's decision to award attorney fees in will contests and under TEDRA for an abuse of discretion. In re Est. of Mower, 193 Wn. App. 706, 727, 374 P.3d 180 (TEDRA action) (citing In re Estate of Black, 153 Wn.2d 152, 173, 102 P.3d 796 (2009)); In re Est. of Bussler, 160 Wn. App. 449, 470, 247 P.3d 821 (2011)

(applying will contest statute, RCW 11.24.050). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

Aldrich sought fees under TEDRA, which allows a court discretion to award reasonable attorney fees and costs "to be paid in such amount and in such manner as the court determines to be equitable." RCW 11.96A.150. Here, the trial court also applied RCW 11.24.050, which gives the court discretion to award attorney fees in will contests as follows: "[i]f the will be sustained, the court may assess the costs against the contestant, including, unless it appears that the contestant acted with probable cause and in good faith, such reasonable attorney's fees as the court may deem proper."

Beede argues that under In re Estate of Rathbone, 190 Wn.2d 332, 412 P.3d 1283 (2018), RCW 11.96A.150 cannot supersede the fee provisions of RCW 11.24.050, which existed before TEDRA was enacted. Instead, Beede contends that under Rathbone, TEDRA can only "supplement, not supplant" other statutory provisions. But Beede takes this language from Rathbone out of its context. Rathbone neither addressed attorney fee provisions in will contests outside of TEDRA, nor did it explicitly overrule cases that recognize courts have discretion to award fees under both RCW 11.96A.150 and RCW 11.24.050. E.g., Atkinson v. Est. of Hook, 193 Wn. App. 862, 873-74, 374 P.3d 215 (2016); In re Est. of Haviland, 162 Wn. App. 548, 569, 255 P.3d 854 (2011); In re Est. of Black, 116 Wn. App. 476, 489-92, 66 P.3d 670 (2003). Rather, Rathbone addressed "whether and to what extent superior courts have authority to intervene in the administration of nonintervention estates." 190 Wn.2d at 334.

Answering that question, the court held that although trial courts under TEDRA had "full and ample power" to oversee judicial proceedings to determine many matters, including will construction, it superseded, rather than supplemented, its authority when it attempted to override a nonintervention will. Id. at 345 (quoting RCW 11.96A.020(1)).

Here, the will was not a nonintervention will, as to which courts' powers are statutorily limited, as the Rathbone court recognized. Additionally, Beede does not deny this action is governed by TEDRA. The TEDRA provision allowing fee awards specifically states, "[t]his section shall not be construed as being limited by any other specific statutory provision providing for the payment of costs, including RCW 11.68.070 and [RCW] 11.24.050, *unless such statute specifically provides otherwise*." RCW 11.96A.150(2) (emphasis added). We agree with Aldrich that RCW 11.24.050 does not limit the court's discretion to award fees under RCW 11.96A.150.

Beede also claims the trial court erred by determining that after receiving the redacted APS records released by the court, she acted without probable cause and in bad faith. "Bad faith is defined as 'actual or constructive fraud' or a 'neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Bentzen v. Demmons, 68 Wn. App. 339, 349 n.8, 842 P.2d 1015 (1993) (quoting State v. Sizemore, 48 Wn. App. 835, 837, 741 P.2d 572 (1987)).

"[W]here a person in good faith brings an action to contest a will and makes a prime facie case, attorney's fees should not be awarded against him in the event his action fails." In re Est. of Chapman, 133 Wash. 318, 322, 233 P. 657 (1925). Also, where a case involves a close question of fact, "it clearly should not fall within [RCW

24

11.24.050]." In re Est. of Hastings, 4 Wn. App. 649, 653, 484 P.2d 442 (1971). For example, In re Estate of Kessler, the evidence was sufficient to establish a presumption of undue influence but ultimately not enough to "establish 'influence tantamount to force or fear,' " and on those facts, the court held there was no basis to conclude that the will contestants were acting without probable cause or in bad faith. 95 Wn. App. 358, 377 n.36, 379, 977 P.2d 591 (1999) (quoting Lint, 135 Wn.2d at 535).

Here, because the trial court does not specify on what facts it determined Beede acted in bad faith after receiving the redacted APS records, and the record does not support a finding of "actual or constructive fraud" or a "neglect or refusal to fulfill some duty," Bentzen, 68 Wn. App. at 349 n.8, the court should not have relied on RCW 11.24.050 to grant fees to Aldrich. However, even if this reliance was improper, the court nevertheless had authority to award fees absent a finding of bad faith by Beede under TEDRA, RCW 11.96A.150, and acted within its discretion in doing so. Therefore, we affirm the trial court's award as a proper exercise of its discretion.

### B. Attorney Fees on Appeal

We may grant an award of reasonable attorney fees on appeal to a party that requests it in its opening brief, if applicable law provides for such an award. RAP 18.1. RCW 11.96A.150 applies to both trial courts and "any court on an appeal." Thus, like the trial court, this court has discretion to award reasonable attorney fees in estate disputes and may consider whatever factors it deems appropriate. RCW 11.96A.150(1).

Beede's request for attorney fees pursuant to RAP 18.1 is untimely as it was first raised in her reply brief. Aldrich does not cite to applicable law supporting his request, including RCW 11.96A.150, as required by RAP 18.1. Rather, he relies on his briefing in

the trial court to support his argument, which he cannot do. <u>See, e.g.</u>, <u>Holland v. City of Tacoma</u>, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("trial court briefs cannot be incorporated into appellate briefs by reference"); <u>Kaplan v. Northwestern Mut. Life Ins. Co.</u>, 115 Wn. App. 791, 800 n.5, 65 P.3d 16 (2003) (party "cannot rely on its briefing to the trial court for purposes of appeal"). Thus, we deny both Beede's and Aldrich's requests for attorney fees on appeal.

CONCLUSION

We affirm the trial court's grant of summary judgment dismissing Beede's claim and award of attorney fees to Aldrich. We deny appellate attorney fees to both parties.


_____Chung, J._____


WE CONCUR:


_____Díaz, J._____          _____[signature]_____